5RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION:  2002 FED App. 0118P (6th Cir.)
File Name:  02a0118p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

MICHELLE BAZZETTA, STACY
BARKER, TONI BUNTON,
DEBRA KING, SHANTE ALLEN,
ADRIENNE BRANAUGH,
ALESIA BUTLER, TAMARA
PRUDE, SUSAN FAIR, VALERIE
BUNTON, and ARTURO
BUNTON, through his next
friend Valerie Bunton, on
behalf of themselves and all
others similarly situated,
            *Plaintiffs-Appellees,*

            *v.*

KENNETH MCGINNIS, Director
of Michigan Department of
Corrections, and MICHIGAN
DEPARTMENT OF
CORRECTIONS,
            *Defendants-Appellants.*

No. 01-1635

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 95-73540—Nancy G. Edmunds, District Judge.

Argued: November 30, 2001

Decided and Filed: April 10, 2002

Before: MERRITT, CLAY, and GILMAN, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Lisa C. Ward, OFFICE OF THE ATTORNEY GENERAL, CORRECTIONS DIVISION, Lansing, Michigan, for Appellant. Deborah A. LaBelle, LAW OFFICES OF DEBORAH LaBELLE, Ann Arbor, Michigan, for Appellee. **ON BRIEF:** Lisa C. Ward, Leo H. Friedman, Mark W. Matus, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Deborah A. LaBelle, LAW OFFICES OF DEBORAH LaBELLE, Ann Arbor, Michigan, Patricia A. Streeter, Detroit, Michigan, for Appellee. Jill M. Wheaton, DYKEMA GOSSETT, Detroit, Michigan, Michael J. Steinberg, Kary L. Moss, AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN, Detroit, Michigan, for Amici Curiae.

_____

**OPINION**

_____

MERRITT, Circuit Judge. Plaintiffs, a class of prisoners incarcerated by defendant Michigan Department of Corrections, and their prospective visitors, sue the department under 42 U.S.C. § 1983, claiming that restrictions on prison visitation imposed in 1995 violate their rights under the First, Eighth, and Fourteenth Amendments.

In 1995, Michigan's Department of Corrections issued new regulations limiting who can visit prisoners. The regulations challenged by plaintiffs (1) banned visits from prisoners' minor brothers, sisters, nieces and nephews; (2) banned all visits by prisoners' children when parental rights had been

terminated; (3) banned all visits by former prisoners who are not immediate family; (4) required that visiting children be accompanied by a parent or legal guardian, and (5) permanently banned visitors, apart from attorneys and clergy, for prisoners who twice violated the department's drug abuse policies.

The new regulations were a response to growth in Michigan's prison population in the early 1990s and the resulting increase in the number of visitors. Department officials believed the increase in visitors made supervising visits more difficult and smuggling of drugs and weapons more difficult to stop. Officials also decided that the increased number of visiting children was a problem because it was difficult for prison guards to supervise children and because the prison environment was bad for the children. We note that there are two kinds of visits, contact and non-contact. Contact visits allow physical contact between a prisoner and visitors, and occur in meeting rooms supervised by prison guards. Non-contact visits occur when a prisoner and visitors sit in separate rooms, but can see one another through a clear window and speak on a telephone. J.A. at 2506-51.

In 1995, plaintiffs challenged the new regulations, asserting they violated plaintiffs' First, Eighth, and Fourteenth Amendment rights. The department defended the constitutionality of the regulations, arguing they were only applied to contact visits, to which prisoners have no absolute right. The district court found plaintiffs' challenge to the permanent ban on visitors for substance abuse violations was not ripe, but upheld the other regulations as they applied to contact visits. *See Bazzetta v. McGinnis*, 902 F.Supp. 765 (E.D. Mich. 1990). We affirmed its decision, holding that "there is no inherent, absolute right to *contact* visits with prisoners," *Bazzetta v. McGinnis*, 124 F.3d 774, 779 (6th Cir. 1997) (emphasis added), but we did not address whether prisoners have a right to non-contact visits. *See Bazzetta v. McGinnis*, 133 F.3d 382, 383 (6th Cir. 1998). Subsequently it turned out that the department seriously misled us and was

applying the regulations to all visits, contact and non-contact. Plaintiffs again brought suit challenging the regulations, this time as applied to non-contact visits. All of the regulations in question apply to non-contact visitors who communicate with prisoners by phone and view them through glass walls.

After a bench trial, the district court found for the plaintiffs. *See Bazzetta v. McGinnis*, 148 F. Supp. 2d 813 (E.D. Mich. 2001). It held that the regulations limiting visits infringed on prisoners' First Amendment right of intimate association and were not reasonably related to a valid penological objective, and that the permanent ban on visitors for two violations of the drug abuse policy infringed on prisoners' First Amendment right of intimate association, was not reasonably related to a valid penological objective, was cruel and unusual punishment in violation of the Eighth Amendment, and was imposed in a manner violating prisoners' Fourteenth Amendment due process rights. Defendants timely appealed.

### *Analysis*

#### *A. Prisoners' rights and legitimate restrictions*

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987). "A prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the correctional system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974); *accord Shaw v. Murphy*, 532 U.S. 223, 228 (2001) ("incarceration does not divest prisoners of all constitutional protections").

The First Amendment guarantees individuals the right to freedom of association, and prisoners retain their First Amendment rights to the extent that the rights do not conflict with their status as prisoners and the legitimate demands of the prison system. *See Pell*, 417 U.S. at 822. Until now, this Court has not addressed whether prisoners retain the right to freedom of association. *See Long v. Norris*, 929 F.2d 1111, 1118 (6th Cir. 1991) ("In the Sixth Circuit we have not

prison officials. Such a procedure falls far below the demands of due process.

We agree with the district court that the permanent ban on visits following two drug violations violates the First, Eighth, and Fourteenth Amendments to the constitution.

### *Conclusion*

Under our constitution, even those lawfully imprisoned for serious crimes retain some basic constitutional rights. Instead of crafting policies that would legitimately meet the very real need to maintain order in prisons, the department has implemented a series of haphazard policies that violated these rights and did real harm to inmates in its care. It then defended these policies not with reasoned arguments, but with misdirection and demands that federal courts blindly defer to corrections officials. Prison officials have great leeway to govern prisons and prisoners as they see fit, if they can provide even a modicum of proof that a particular policy is desirable and serves legitimate ends. Here, as Judge Edmunds found in the case below, the department was unable to offer any convincing justification for its policies.

Years ago Winston Churchill made a telling statement about prisoners: "[a] calm and dispassionate recognition of the rights . . . even of convicted criminals against the state, a constant heart-searching by all those charged with the duty of punishment . . . .these are the symbols in which the treatment of crime and criminals mark and measure the stored-up strength of a nation." Speech in Parliament, Hansard column 1354, 20 July 1910. In the present case, the regulations fall below minimum standards of decency owed by a civilized society to those who it has incarcerated.

The district court's decision is AFFIRMED.

successful return to society." *Bazzetta*, 148 F. Supp. 2d at 851. It "goes to the essence of what it means to be human; it destroys the social, emotional, and physical bonds of parent and child, husband and wife, body and soul. Nothing could be more fundamental." *Id*. at 855. It far exceeds punishments meted out by any other state prison system for comparable violations. *See id*. at 835. The second condition is also met, for the harm the ban does prisoners should be clear to any prison official minimally concerned with prisoners' welfare. Extensive evidence supports the district court's finding that the "restriction has been imposed with a callousness that could serve as the definition of deliberate indifference." *Id*.

Finally, as imposed the punishment violated prisoners' due process rights. Not every prison deprivation merits due process; for a punishment to require due process it must exceed the sentence imposed in a notably "unexpected manner," *Sandin v. Conner*, 515 U.S. 472, 483 (1995), or constitute a change in conditions of confinement that amounts to a "grievous loss." *Vitek v. Jones*, 445 U.S. 480, 488 (1980). Applying these measures, we find that a complete ban on all visitors is such a grievous loss that it infringes on a liberty interest protected by substantive due process. Imprisonment inevitably limits who can visit a prisoner, but it does not dissolve inmates' marriages nor end their parental rights. A complete ban on all visitors cuts the prisoner off from all personal ties, constituting qualitatively greater isolation than is imposed by a prison sentence, and is an atypical and significant hardship far beyond the expected hardships of prison.

At a minimum, some notice and hearing is required before a prisoner is deprived of a constitutionally protected liberty interest, the degree of protection varying with the interest. *See Vitek*, 445 U.S. at 494-95. Though Michigan inmates are given a hearing before being found guilty of a specific drug offense, they receive no notice or hearing before officials impose the permanent ban. Once the violations are recorded, the ban is imposed or removed at the unfettered discretion of

decided the degree to which prison inmates retain their freedom of association"). This question is squarely before us now. For plaintiffs to make out their claim under § 1983, they must retain some right to freedom of association, contrary to defendants' assertion that there are no such rights.

We hold that prisoners do retain a limited right to freedom of association--specifically non-contact visits with intimate associates--even while incarcerated. This follows clearly from *Pell*, where the Supreme Court held that a prisoner retains a First Amendment right unless it is incompatible with incarceration. *See* 417 U.S. 822. Imprisonment does sharply limit inmates' right of association. For instance, prisoners who pose a security risk have no right to remain in the general prison population, *see Hewitt v. Helms*, 459 U.S. 460, 468 (1983) (holding temporary, nonpunitive transfer to administrative segregation does not violate a prisoner's constitutional rights), and prisoners have no constitutional right to contact visits, *see Bazzetta*, 133 F.3d at 383 (holding prisoners have no constitutional right to contact visits); *accord Thorne v. Jones*, 765 F.2d 1270, 1274 (5th Cir. 1985) (holding incarcerated individuals maintain no right to physical association). But the right of association is not wholly extinguished by imprisonment.

In support of its claim that inmates retain no right of association, the department cites Supreme Court cases which hold that prisoners do not have a right to unfettered or contact visits. *See, e.g.*, *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 460 (1989) (inmates have no right to "unfettered visitation"); *Jones v. North Carolina Prisoners' Labor Union Inc.*, 433 U.S. 119, 125 (1977) (upholding ban on inmate union organizing and group meetings); *Pell*, 417 U.S. at 826 (upholding ban on visits by journalists). None of these cases, however, say that prisoners have no right to visitation, and several caution that they should not be read to reach such a conclusion. In *Thompson*, the Court warned that "[n]othing in the court's opinion forecloses a claim that a prison regulation permanently forbidding all visits to some or all prisoners implicates the protections of the due process

clause in a way that the precise and individualized restrictions" at issue there do not. 490 U.S. at 465 (Kennedy, J. concurring). In *Pell*, the Court upheld a ban on visits from journalists, but noted that the regulation was permissible in part because prisoners retained "an unrestricted opportunity to communicate with the press or any other member of the public through their families, friends, clergy, or attorneys who are permitted to visit them at the prison." 417 U.S. at 825. Far from holding that prisoners had no right to visits, the *Pell* Court analyzed the new restrictions before upholding them, and stated that it would not defer to prison officials when there was "substantial evidence in the record to indicate that the officials [had] exaggerated their response" to a problem. *Id*. at 827. Close analysis is especially appropriate when, as is the case here, the challenged restrictions interfere with family relationships, including the parent-child bond, specially protected by the Constitution. *See, e.g.*, *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996) ("Choices about marriage, family life, and the upbringing of children are among associational rights this Court has ranked as of basic importance to our society, rights sheltered against the State's unwarranted usurpation, disregard, or disrespect" (internal citations omitted)); *Moore v. City of East Cleveland*, 431 U.S. 494, 499 (1977) (there is a "private realm of family life which the state cannot enter" (citation omitted)); *Pierce v. Society of Sisters*, 268 U.S. 510, 534 (1925) (parents have the liberty to "direct the upbringing and education" of their children).

The fact that a prison regulation interferes with a constitutional right does not mean it will be struck down. In most situations, when evaluating such a regulation, federal courts will defer to state prison officials' reasoned judgment that the regulation is necessary and appropriate.

[T]he problems of prisons in America are complex and intractable, and . . . they are not readily susceptible of resolution by decree. Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources. . . .    Prison administration is, moreover, a task that has been

drug abuse is a legitimate penological goal. At trial, however, department officials produced only anecdotal evidence to show that the permanent ban on visitors has deterred drug abuse in the prison population. Once visitation is banned, there are no easy alternatives for keeping ties with family and friends outside prison. Brief phone calls cannot substitute for seeing a loved one, nor does the liberty to send and receive letters mean much to functionally illiterate prisoners. Finally, prison officials have at their disposal many other constitutional means of punishing prisoners for violating drug rules. There is no reasonable relation between the permanent ban and a legitimate penological interest.

*2. Cruel and Unusual Punishment and due process*--The permanent ban on visitors also violates the constitution's ban on cruel and unusual punishments, and the protections of the due process clause. *See* U.S. Const. Amts. VIII, XIV. The Eighth Amendment protects inmates not only from disproportionate and cruel sentences, but also from disproportionate and cruel conditions of confinement. *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976). "Conditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). A prison official's actions violate the Eighth Amendment when (1) they are "sufficiently serious" to deprive an inmate of the "minimal civilized measures of life's necessities," and (2) the official knows of and disregards the significant risk they pose to an inmate's health and safety. *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994). "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact the risk was obvious." *Id*. at 842

Both those conditions are met here. As the district court found, depriving an inmate of all visitors for a period stretching indefinitely into the future is an extremely harsh measure, removing the "single most important factor in stabilizing a prisoner's mental health, encouraging a positive adjustment to . . . incarceration, and supporting a prisoner's

839.  While a hearing is required before a substance abuse violation is assessed against a prisoner, no hearing is required before imposing the permanent ban, nor are prison officials required to explain why a ban was imposed.  *See id*. at 838 n.39.

In practice, as the district court amply documented, the department has imposed visitation bans capriciously and according to no reviewable standards.  Between 1995 and 2000 only 41% of prisoners with two violations received permanent visitation bans.  *Id*. at 837.  Bans were often not imposed until well after a prisoner incurred the violations; an average of seven months passed between a second substance abuse violation and the imposition of a ban, and in a few cases three years passed between a second violation and the start of the ban.  *Id*. at 837-38.  Nor is the ban only imposed after two "serious" violations; on occasion it is imposed for what is effectively a single drug infraction.  One inmate received a permanent ban after being found in possession of marijuana (violation #1) and then testing positive for the drug 75 minutes later (violation #2); another received a permanent ban after throwing a packet of marijuana on the ground (violation #1) then being found with another on his person during the ensuing search (violation #2).  *Id*. at 838 n.39.

Most troubling, once a ban is imposed it can only be removed at the discretion of prison officials, who need not explain their decisions and may continue the ban for any reason or no reason at all.  The department has described the ban as a two-year ban, but in fact it is a permanent ban that may be removed after two years.  Nor is it continued only for serious infractions; as the district court determined, the department has turned "permanent restrictions for substance abuse . . . into a tool for general behavior management, where restrictions are routinely continued on the basis of behavior for which policy does not authorize a visiting restriction in the first place."  *Id*. at  844.

*1. The* Turner *test*--This harsh and arbitrary ban does not meet even the forgiving *Turner* standard.  Deterring prisoner

committed to the responsibility of [the legislative and executive] branches, and separation of powers concerns counsel a policy of judicial restraint.

*Turner*, 482 U.S. at 84-85.  In *Turner v. Safley*, the Supreme Court laid down a deferential test for evaluating such regulations: "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to a legitimate penological interest."  *Id*. at 89.  In applying this broad standard, we ask a series of questions: whether there is a valid connection between the regulation and a penological interest; whether prisoners retain an alternative means of exercising the right; whether assertion of the right will have a significant effect on guards and other inmates;  and  whether  prisoner  officials  have  ready alternatives to the infringing regulation. *See id*. at 89-90.  "As long as prison authorities present evidence to support their judgment that prison security will be undermined in the absence of a challenged regulation, we will not substitute our judgment for theirs."  *Brown v. Johnson*, 743 F.2d 408, 412-13 (6th Cir. 1984).

### B.  The Department's Restrictions on Visitors

Plaintiffs ask us to strike down the regulations if we find they significantly infringe visitors' First Amendment rights.  The Supreme Court has made clear, however, that such an approach would unreasonably constrain the corrections system.  We therefore analyze the regulations solely as they infringe on prisoners' rights.  *See Thornburgh v. Abbott*, 490 U.S.  401,  410 n.9  (1989)  (heightened scrutiny is not appropriate even in circumstances where a prison regulation affects rights of both prisoners and outsiders).

*1.  Minor brothers, sisters, nieces, and nephews.*--The first challenged regulation forbids visits from a minor child "unless he or she be the child, stepchild, or grandchild of the prisoner or an emancipated minor."  Mich. Admin. Code

§ 791.6609(2).[1]  Plaintiffs challenge this ban to the extent it prevents visits from prisoners' siblings, nieces, and nephews.

At trial, the department claimed this restriction was needed to reduce the number of visitors to manageable levels, to stop smuggling, and to protect children from exposure to the prison environment. On appeal, the department does not offer a specific defense of this particular regulation or the other regulations, instead it asks this court to hold there is no right to visitation, or alternatively simply to defer to its judgment that the measures are necessary to ensure prison safety. For the sake of thoroughness, we address claims made by the department at trial.

First, the department claimed the regulation was necessary to reduce the number of visitors, who it said were overwhelming prison facilities. Department officials hoped the new regulations would reduce visits by 10-15%, at which point they apparently believed visits would again be manageable. After the new regulations were passed, the department's figures show, visits fell by half. *See Bazzetta*, 148 F. Supp. 2d at 820-21. Like District Judge Edmunds, we view the banning of visits from minor sisters, brothers, nieces, and nephews as an exaggerated response to perceived problems in prison visitation. The record shows that, when the defendants implemented the new regulations, they had no idea how many visitors would be affected by them, or what the effect would be on visitors and inmates. *See id.* at 821. In light of these facts, the regulations appear as attempts not to manage visits but to end them. Had prison officials merely wished to reduce the number of visiting children, they had at hand less stringent alternatives, including banning visits from

---

[1] After the district court handed down its opinion, Michigan moved to change its policy and allow visits from minor siblings. Appellant's Br. at 7. As Michigan did not make this change until after the district court handed down its opinion, however, and because it still defends its right to impose this or any other restriction on visits, we address the regulation here.

may be imposed after two violations, with the approval both of an inmate's warden and the department's director.[2]

Department regulations state that inmates may request the ban be lifted after two years, but it provides officials "no ascertainable criteria" for evaluating these requests. *Id.* at

---

[2] Here are the relevant regulations:

BBB. . . . The Director may permanently restrict all visits for a prisoner who is convicted of any of the following: . . . .

4. Two or more violations of the major misconduct charge of substance abuse.

CCC. If a prisoner has been found guilty of the conduct set forth in Paragraph BBB, the warden shall recommend that all visits be permanently restricted. S/he shall submit the recommendation, along with all supporting documentation, to the appropriate [regional prison administrator]. The [administrator] shall review and forward the recommendation to the []Deputy Director for review. If the []Deputy Director agrees that the restriction is warranted, the recommendation shall be submitted to the Director for a final determination. . . . .

FFF. The Director may remove a restriction upon written request of the warden or restricted prisoner, subject to the following: . . . .

2. The restriction shall not be considered for removal until at least two years after imposition . . . if it is based on two or more violations of the major misconduct charge of substance abuse if one or both of the charges were for possession or use of any prohibited substance other than alcohol. . . .

GGG. If eligible for removal of the restriction . . . a prisoner may request removal of the restriction by sending a written request to the warden of the facility where the prisoner is housed.

1. If the prisoner is eligible for removal of the restriction, the warden shall submit his/her written recommendation, along with the prisoner's written request if one was submitted, to the appropriate [regional prison administrator]. The [administrator] shall review and forward the documentation to the [Correctional Facilities Administration] Deputy Director. The [] Deputy Director shall review the request and make a written recommendation to the Director for a final determination. If denied, the Director shall determine when the prisoner may reapply for removal of the restriction.

*Bazzetta*, 148 F. Supp. 2d at 833-34 (quoting Michigan Department of Corrections policy directive 05.03.140)

except their wish to reduce the overall number of visitors and protect children. A few officials did voice concerns that a power of attorney could be forged, but they did not cite a single instance where such a forgery had occurred in the past, nor were they able to explain why someone would wish to commit such a forgery. *See id*. at 833.

The justification for this policy is weak, but the harm done is readily apparent. As the district court found, "unrefuted evidence submitted by plaintiffs . . . [showed that] many prisoners, especially women, do not have another immediate family member available to bring their child to visit," and instituting a guardianship for the children involved a "complex legal . . . procedure" beyond the resources of many prisoners. *Id*. The ban on visits from children unaccompanied by a guardian or immediate family member is thus for many prisoners a ban on visits from their children. The department has produced no credible penological objective to be met by such a cruel policy. We uphold the district court's decision.

### C. The Two-strikes ban for substance abuse

The department also issued a regulation imposing a "*[p]ermanent* ban [on] *all* visitation (other than attorneys or clergy) for prisoners with two or more major misconduct charges of substance abuse." Mich. Admin. Code. § 791.6609(11) (emphasis added). The regulation was part of a "zero tolerance" approach to drug abuse, intended not to prevent smuggling, but to punish prisoners caught with drugs. *See Bazzetta*, 148 F.Supp.2d at 843. Major misconduct charges issue for possession of narcotics, alcohol, unauthorized prescription drugs, or drug paraphernalia, or for failure to submit to a drug test. They are not criminal convictions, but administrative punishments issued by prison authorities after a hearing. According to regulations, the ban

unrelated children, which would have reduced visitors without straining close family ties.

The department also claims that the new regulations are required to stop smuggling and to protect would-be child visitors. It offers no data or expert testimony to support these claims, relying instead on prison officials' "vast experience" to justify the restrictions. Appellant's Br. at 10. As the district court pointed out, non-contact visits prevent both smuggling by, and possible assaults on, child visitors. Prison officials also stated that they opposed allowing children to visit because visiting would cause the children to become "too comfortable" with prisons and, we presume, lead them to a life of crime. *See Bazzetta*, 148 F. Supp. 2d at 824. This determination is for parents to make, not prison officials. Prison officials do not stand *in loco parentis* for visiting children; and the desire to make children frightened of prison, or of relatives in prison, has little to do with maintaining prison safety, the stated objectives of the regulations.

The department also defended the regulations by arguing that letters and phone calls are adequate alternatives to visits for inmates who wish to keep in touch with minor relations. That is not the case. At trial, unchallenged expert testimony showed that 40 to 80% of inmates are functionally illiterate, unable to compose a letter. Phone calls are also unsatisfactory. They are monitored by department staff and terminated after a few minutes. *See id*. at 818 n.2.

While the department offered no clear benefits to be gained from excluding prisoners' minor siblings, nieces, and nephews, plaintiffs offered over a dozen witnesses who testified to the myriad of ways the restrictions on minor visitors disrupted family relationships, particularly where prisoners had performed parental duties for their siblings, nieces, or nephews. *See id*. at 829-30.

For the above reasons, we find that the department's prohibition on non-contact visits from inmates' minor siblings, nieces, and nephews is not reasonable related to a

legitimate penological goal.  The district court's decision is affirmed.

*2.   When parental rights are terminated*.--The second challenged regulation forbids a prisoner's natural child from visiting if "[t]he parental rights of the prisoner to the child have been terminated."     Mich.  Admin.  Code § 791.6609(6)(a).  Plaintiffs challenge this regulation only as it has been applied to visits from children whose parents have voluntarily surrendered their parental rights so a child could be placed for adoption;  they do not, presumably, challenge the ban on visits from children when the parents' rights were terminated for abuse or neglect.  Plaintiffs' Br. at 35.

The department offers no specific reason why it decided to ban visits from these children, except its general desire to reduce the number of visitors and protect children.  We have already stated why these reasons are not sufficient to ban visits from minor siblings, nieces and nephews.  For identical reasons, we hold these reasons are also not sufficient to block visits from an inmate's child, when the inmate has voluntarily surrendered parental rights in the child's best interests.  As the district court noted, in such situations "contact between parent and child is an important ongoing need for both parent and child." *Bazzetta*, 148 F.Supp.2d at 832.  In one instance, the department's policy prevented a therapist-recommended and court-ordered visit from a child recently placed for adoption, threatening the child's well-being.  J.A. at 2763-68.  A ban on such visits is not reasonably related to a legitimate penological interest.  We affirm the district court's decision.

*3.  Former prisoners*.--The third challenged regulation bans visits from "a prisoner, a former prisoner, a probationer, or a parolee" other than a prisoner's immediate family.  Mich. Admin. Code § 791.6609(7).  This regulation is intended to prevent "illegal or disruptive activity occasioned by such visits." *Bazzetta*, 148 F.Supp.2d at 832.  Like the other challenged regulations, this had significant unintended consequences.  In many instances, "exclusion of former prisoners creates significant hardship on friends and family,

including instances where former prisoners have been completely rehabilitated and have served as social workers or governmental ombudsmen." *Id*.  In one instance, a child was not allowed to visit to her imprisoned mother because the only adult available to bring her was the child's father, who was not married to the mother (and so not "immediate family") and who had been convicted of a crime 23 years before.  J.A. 5713-15.

It is a closer call whether this regulation is reasonably related to a legitimate penological objective.  The asserted goal, the prevention of disruption by ex-convicts, is a legitimate penological objective.  A blanket ban on all noncontact visits by former inmates is, however, an exaggerated response to the problem raised by visits with ex-convicts.  It prevents visitors with legitimate reasons for seeing prisoners, such as social workers, from doing so.  The department has at hand a ready alternative for weeding out disruptive visitors: all visitors must pass a department screening procedure before getting permission to visit.  This gives department officials an opportunity to stop would-be troublemakers.  We also observe that the department has no working procedures for making reasonable exceptions to this ban.  While department regulations state a warden can grant a waiver of the ban when it is in the best interests of the prisoner, *see* Mich. Admin. Code § 791.6609(3), in practice some wardens appear to refuse to grant any waivers. *See* J.A. 5713-15.  We find that such an inflexible ban on former prisoners is not reasonably related to a legitimate penological objective, and uphold the district court's decision.

*4.  Children must be accompanied by immediate family or legal guardian*.--The fourth challenged regulation requires that children who do visit be accompanied by an immediate family member or legal guardian.  Mich. Admin. Code § 791.6609(5).  Before 1995, children were also allowed to visit when accompanied by an adult with a valid power of attorney.  Plaintiffs argue that this was sufficient to guarantee a child's safety, and ask that the *status quo ante* be restored. Prison officials submitted no reasons for changing the policy,