**FIRST DEFENSE LEGAL AID, Plaintiff,**

v.

**CITY OF CHICAGO, et. al., Defendants.**

**No. 01 C 9671.**

United States District Court, N.D. Illinois, Eastern Division.

Sept. 9, 2002.

Locke E. Bowman, Jean Maclean Snyder, Joel Hunter, Senior Law Student, Molly Kim, Senior Law Student, MacArthur Justice Center, University of Chicago Law School, Chicago, IL, Craig B. Futterman, Edwin F. Mandel Legal Aid Clinic, University of Chicago Law School, Chicago, IL, for plaintiff.

Mara S. Georges, Corporation Counsel, Alec M. McAusland, Assistant Corporation Counsel, Allen Duarte, Assistant Corporation Counsel, Commercial & Policy Litigation Division, City of Chicago, Department of Law, Chicago, IL, for defendant, City of Chicago.

June K. Ghezzi, Daniel E. Reidy, Jason G. Winchester, Susan L. Winders, Jones, Day, Reavis, & Pogue, Chicago, IL, for defendants, Hillard, Trigg, Green, Kobel, and Mahnke.

Paul A. Castiglione, Assistant State's Attorney, Louis R. Hegeman, Assistant State's Attorney, Patrick T. Driscoll, Jr., Deputy State's Attorney, Cook County State's Attorney's Office, Chicago, IL, for defendant, Cook County State's Attorney Richard A. Devine.

## *FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER AWARDING INJUNCTIVE RELIEF*

SHADUR, Senior District Judge.

These findings of fact ("Findings") and conclusions of law ("Conclusions") are being entered in this action brought by First Defense Legal Aid ("FDLA") against City of Chicago ("City"), its Police Superintendent and four of its Police Area Command-

ers (collectively "Police Defendants") and Cook County State's Attorney Richard Devine. Because the evidence adduced by the parties calls for the entry of a permanent injunction in favor of FDLA and against all defendants, the Findings and Conclusions are being promulgated pursuant to Fed.R.Civ.P. ("Rule") 52(a), followed by the entry of an order granting the appropriate permanent injunctive relief. To the extent (if any) that the Findings as stated may be deemed conclusions of law, they shall also be considered Conclusions. In the same way, to the extent (if any) that matters later expressed as Conclusions may be deemed findings of fact, they shall also be considered Findings. In both of those respects, see *Miller v. Fenton,* 474 U.S. 104, 113–14, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985).

### FINDINGS OF FACT

These Findings are drawn from evidence presented at a three day evidentiary hearing ("Hearing," held on June 7, June 12 and June 25, 2002) on FDLA's motion for a temporary restraining order ("TRO") and from the affidavits submitted in conjunction with the Hearing. Although all parties have been offered the opportunity to supplement the TRO hearing record, all have agreed that the record may be considered as the ultimate record in the case and that it suffices to enable this Court to determine whether and to what extent FDLA should be awarded permanent injunctive relief on its Complaint (see, e.g., City and Police Defendants Proposed Finding ¶ 21; State's Attorney Proposed Findings and Conclusions at 3; FDLA's Proposed Findings at 1).

These Findings include both matters directly testified to during the Hearing and inferences drawn from that testimony in accordance with the well-established rule that the trial court may draw reasonable inferences from the evidence in making its findings. *See, e.g., McDermott v. John*

*Baumgarth Co.,* 286 F.2d 864, 868 (7th Cir.1961) ("It is a function of a trial judge to draw reasonable inferences from the facts appearing before him"); *BASF Corp. v. Old World Trading Co.,* 41 F.3d 1081, 1097–98 (7th Cir.1994).

### Parties

1. FDLA is a non-profit legal aid agency formed in 1994 for the purpose of providing free legal counsel to indigent persons at Chicago police stations during questioning by the police and other law enforcement officials. Tr. 52–53.

2. City is a municipal corporation, organized under the laws of the State of Illinois, that operates the Chicago Police Department ("Department").

3. Police Defendants comprise Department's Superintendent Terry Hillard and four of Department's Area Commanders: Area One's Frank Trigg, Area Two's Walter Green, Area Four's Richard Kobel and Area Five's Gerald Mahnke.

4. Richard A. Devine is the State's Attorney of Cook County.

### FDLA's Work

5. FDLA was organized to afford counsel to indigent persons in police stations who need advice concerning their legal rights but would not otherwise have counsel. Under the Illinois Public Defender statute, counsel are provided to indigent defendants at the time of their initial court appearances, not before. Thus, in the words of FDLA's Executive Director Darron Bowden, FDLA fills a "critical gap" by working to "make real" the opportunity of indigent individuals to consult with counsel at police stations before they are charged. Otherwise such persons, even if they were to request counsel, would not in practice have a lawyer available to them. Tr. 52–53.

6. FDLA operates a 24 hour hotline, with a widely publicized number (1–800–

LAW–REP4) that people can call when a family member or friend has been taken to a Chicago police station. FDLA gets information about the person being held[1] from the caller and, where the case meets FDLA guidelines, sends a lawyer to the police station to assist that person. Tr. 52–54, 80–81. At the time of the Hearing, FDLA's policy was to respond to calls requesting assistance for juveniles and for persons being held in connection with felony offenses, as well as in cases in which the person is alleged to have been injured or a victim of police misconduct. Tr. 59.

7. When FDLA attorneys appear at Chicago police Area Headquarters to speak with a person there, it is because they have been specifically requested by a friend or family member to assist that person. Those requests suffice to create an attorney-client relationship between the FDLA attorney and the person being held.

In each instance the FDLA attorney informs police personnel at the station that he or she has been retained to represent that specific person and requests the opportunity to speak with the individual. See Tr. 60–61, 80–81.

8. Since its inception in 1994, FDLA has responded to well over 10,000 calls received through the hotline. Tr. 53. FDLA focuses its outreach and its services on low-income communities in which a relatively high proportion of the population has had or is having some involvement with the criminal justice system. Tr. 56. FDLA provides its services through a staff of three paid lawyers and a group of approximately 50 volunteer attorneys whom FDLA recruits, trains and supervises as they provide that representation.

9. In the course of its direct representation, FDLA represents both persons who are in custody[2] as suspects in criminal

1. These Findings use "held" to describe the condition in which persons remain at Chicago police stations for questioning by the police. See this Court's July 18, 2002 Memorandum Opinion and Order ("Opinion," 209 F.Supp.2d 935, 939 n. 4). Although the term is not used to describe the technical status of being "in custody" for purposes of Miranda and affiliated rights, both the evidence during the Hearing and recent Illinois Appellate Court caselaw (see Finding 26) give the lie to defendants' position that the police are meticulous in maintaining a bright line between persons being questioned as witnesses (and hence free to leave at any time) and persons being questioned as targets of investigations or suspects (and hence entitled to Miranda warnings and a constitutional right to counsel). That purported bright-line "justification" for the tactics employed by the police and Assistant State's Attorneys described in these Findings depends on a fiction rejected by the Illinois courts and by this Court. Especially in that light, the common usage of "held" accurately conveys the circumstances in which witnesses remain at Chicago police stations for questioning. Nonetheless, counsel for State's Attorney Devine continue to distort the nature of this action by wrongly asserting that FDLA somehow shifted (1)

from addressing the associational rights of persons who are actually "in custody" in the sense that triggers Miranda and other procedural safeguards (2) to addressing the rights of persons who are assertedly held for questioning as witnesses (see, e.g., State's Attorney Proposed Findings and Conclusions at 2–3 and his Findings ¶¶ 1–8 and Conclusions ¶¶ 37–38). At this stage that position is nothing short of irresponsible (to say nothing of being purely diversionary, as well as exemplary of poor lawyering): Any misapprehension that may potentially have been created in the first instance by an imprecise use of terms such as "held" and "custody" was never shared by this Court, and it surely should have been dispelled in all events at the earliest stages of the litigation. To any reasonable reader and listener, it was clear from the very outset that FDLA was complaining about its forced isolation from witness-clients and not from suspect-clients.

2. These Findings use the term "in custody" in the formal, technical sense to refer to the status of being under arrest and entitled to the protections of Miranda and its progeny, in contrast to the nontechnical use of the term "held" (see n. 1).

investigations and persons who are not in custody but are being held at the police station for questioning as witnesses to an offense.

10. In addition to its direct representation, FDLA engages in issues-related advocacy on topics that it learns of in the course of its direct representation and that it deems significant. FDLA also engages in public education and public outreach as to the rights of persons to consult with counsel when they are held at police stations. Tr. 53–54.

11. FDLA's successful performance of its organizational mission depends upon its being perceived in the community as a capable and diligent defender of the constitutional and statutory rights of its client population. When FDLA asserts such rights on behalf of its clients and the police refuse to honor those assertions, FDLA's credibility is diminished in the eyes of its clients. Tr. 57–58.

12. There was no credible evidence at the Hearing that FDLA engages in direct representation of clients in anything other than a lawful and ethical manner or that FDLA seeks to advance any goal other than protecting the best interests of the client-witnesses themselves.

13. On a number of occasions Chicago police have refused FDLA attorneys permission to meet and speak at Chicago police stations with witnesses whom FDLA has been asked to represent:

(a) On two occasions earlier this year, FDLA Executive Director Bowden was denied access to witnesses. On one of those occasions (at Area Two police headquarters) the witness was held for over five hours, and when he emerged from the police station his belt was in his hands and he was missing his car keys, which the police said they had misplaced. Tr. 64–68.

(b) On May 22 and 23, 2002 FDLA attorney Sladjana Vuckovic ("Vuckovic") and FDLA volunteer attorney Leonard Goodman ("Goodman") were refused permission to speak with two clients, Andre Winston ("Winston") and Dijuan Davis ("Davis"), who were held at the Area Four police headquarters for questioning for over 24 hours. Tr. 81–90.

(c) On June 4, 2002 attorney Vuckovic was refused permission to speak with a client-witness named Karen Terrell. Tr. 90–95.

(d) In June 2002 FDLA attorneys were barred from access to a number of witnesses who were being held by the police for questioning in connection with the investigation of the murder of Chicago Police Officer Brian Strouse. Tr. 295–302.

(e) Attorney Vuckovic estimated in her testimony that she personally has been refused access to witnesses at Chicago police stations on 25 occasions since she became FDLA's Legal Director in January 2001. Tr. 112–13.

(f) FDLA attorney Dawn Sheikh ("Sheikh") estimated that her experience included 7 to 10 occasions on which she had been refused permission to speak with witnesses being held at Chicago police stations. Tr. 269–70.

14. Because of the volume and ongoing nature of FDLA's work and in light of the positions taken by defendants and their counsel during the Hearing and throughout this litigation, it is more than reasonable to infer—and this Court expressly finds—that FDLA will continue to face large numbers of future denials of access to witnesses whom it has been asked to represent unless this Court enjoins defendants from doing so.

### Defendants' Policy

15. Defendants acknowledge that the denials of access described in Finding 13 have taken place pursuant to a policy and standard practice under which the Chicago police refuse to permit contact between witnesses being held at the police station and attorneys who come there seeking to counsel them (see, e.g., City and Police Defendants Proposed Findings ¶¶ 51–53). During the Hearing Chicago Police Chief of Detectives Philip Cline and Chicago Police Lt. John Farrell described that policy and standard practice in these terms:

(a) Witnesses who are taken to police stations for questioning are thoroughly searched and are then "secured" by being locked into small, windowless interrogation rooms, where they remain typically for many hours, and in some cases for days. Tr. 185–88, 98, 150, 353–55; see also Winston Aff. ¶¶ 1–2; Davis Aff. ¶¶ 1–2.

(b) One reason for isolating witnesses and questioning them in locked interrogation rooms in the police station is to "overcome [their] reluctance" to cooperate with the police. Tr. 184–85.

(c) Chicago police do not permit attorneys to have access to such witnesses when attorneys appear at the police station and advise the police that they have been asked to represent the witnesses. Tr. 156.

(d) Witnesses are not informed of an attorney's presence when the attorney comes to the station seeking to represent the witness. Tr. 170.

(e) Witnesses are permitted to communicate with attorneys only if they spontaneously ask to do so. Tr. 194.

(f) When a spontaneous request is made by a witness, the police attempt to discourage the contact, telling the witness either that he does not need a lawyer or that it is better if fewer people know he is at the station, or both. Tr. 194, 235–36. Only if the witness nonetheless "insists" on counsel will he be permitted to communicate with an attorney. Tr. 236, 245–47.

### Defendants' Policy in Practice

16. FDLA presented unrefuted testimony as to defendants' implementation of the policy described in Finding 15 in individual situations:

(a) FDLA clients Winston and Davis were held incommunicado as witnesses in small, windowless and locked interrogation rooms from the early evening of May 21, 2002 until the morning of the next day. They were not offered anything to eat until morning, and their requests to go to the bathroom were sometimes ignored. Winston made repeated requests to leave the station that the police ignored. Both men felt that they were not free to leave during the more than 24 hours that they were held. During that time FDLA attorneys who had been retained to represent Winston and Davis asked to see their clients at the police station, but they were denied access to their clients. Police refused even to inform Winston or Davis that their attorneys were present and available to consult with them. Winston Aff. ¶¶ 1–6, 8, 9; Davis Aff. ¶¶ 1–6, 9; Goodman Aff. ¶ 4; Vuckovic Aff. ¶¶ 3–5; Tr. 84–87, 285–87.

(b) On another occasion, when FDLA represented a number of witnesses in connection with the murder of police officer Brian Strouse in June 2001, the attorneys sought unsuccessfully to see their clients for approximately 14 hours. During that

time attorney Sheikh both heard and observed her client, while handcuffed to a chair, shout that he wanted an attorney; yet she was never granted access to him. Tr. 295–301.

(c) FDLA Director Bowden represented a man, held at Area 2 for more than five hours, who emerged from the police station with his belt in his hand and without his car keys, which the police said they had misplaced. Police denied attorney Bowden, who was there with his client's mother, access to his client for more than five hours because the client was "just a witness." Tr. 64–68.

In each of those instances the police refusal to allow the FDLA attorney access to his or her client or to inform the client-witness that an FDLA attorney was present at the police station to aid him was not a random aberration, but rather the result of the deliberately adopted and enforced policy described in Finding 15.

### Defendants' Purpose

17. FDLA's mission is to inform persons being held by Chicago police of the limits on police authority to hold and interrogate them and to inform those persons of their right to the assistance of counsel. Tr. 52–54. In appropriate circumstances FDLA attorneys would counsel a witness that he has no obligation to cooperate with the police, if such cooperation might run counter to the witness's own best interests. Tr. 73–75. FDLA attorneys work actively to convey that message to persons the police have detained and to the persons in the community (families and friends) who then retain FDLA to represent such persons. FDLA's message as to the rights of witnesses held at Chicago police stations is a truthful message that accurately and honestly reflects the legal rights of the intended audience.

18. Defendants employ their policy of preventing contact between witnesses being held at police stations and attorneys who come there to counsel them (see Finding 15) for the express purpose of keeping the witnesses in ignorance of the attorney's presence in the police station and, ultimately, of the information and advice that the lawyer may convey. Tr. 158–59, 253–54, 259–62.

19. Defendants work to indoctrinate the witnesses they are holding to the view that they should cooperate with the police investigation and that any concern they might harbor for their own interest is unwarranted. When witnesses ask to speak with a lawyer, the police discourage the witnesses from taking that course, telling them that they do not really need a lawyer. Tr. 194, 235–36, 245–47.

20. Lt. Farrell explained that the police are particularly motivated to block FDLA attorneys from access to witnesses at police stations because of the content of the message that police believe FDLA attorneys would convey to their clients. Tr. 189–90. Lt. Farrell was unequivocal that the content of FDLA's communication is a "[v]ery important concern." As he confirmed, defendants' problem is with FDLA's message:

> From experience, I know that the First Defense attorney is going to tell the witness not to speak to the police, not to further cooperate with the police.

Tr. 158–59; see also Tr. 195.

21. Chief Cline similarly testified that attorney-witness contact is not allowed because the police want to keep witnesses in ignorance of whether their attorneys are seeking to speak with them and of the information that such attorneys might convey. Tr. 253–54, 259–62.

22. Although police bar access between defense lawyers and witnesses, they per-

mit others to speak with witnesses when they believe it serves the purpose of securing the witnesses' cooperation in investigations. For example, Chief Cline admitted during his testimony that a "pastor, friend or brother" of witnesses would be permitted to speak with the witnesses if doing so "will keep them there and keep them cooperating with us." *See* Tr. 236–37.

23. In addition, Assistant State's Attorneys are permitted to interview witnesses. Indeed, one of the purposes for bringing witnesses to the station is to enable Assistant State's Attorneys to conduct such interviews. Tr. 144.

24. Police further testified at the Hearing that their purpose in refusing to permit FDLA lawyers to have contact with any client-witness in police stations is to enable the police to develop "rapport" or a "personal bond" with the witness in order to secure the witness' corporation in an investigation. *See, e.g.,* Tr. 144–45, 147–48, 194, 236–37.

25. It is clear from the manner and the context in which the preceding testimony was presented, and this Court finds, that the police references to "rapport" and "personal bond" are nothing more than a euphemistic way of describing defendants' actual purpose in forbidding any contact by FDLA attorneys: to prevent any person from informing witnesses of their right not to cooperate in police investigations and, thereby, to keep the witnesses in ignorance of any such right.

### Conditions Under Which Witnesses Are Held for Questioning

26. Defendants also claimed at the Hearing that the police practice is to inform witnesses being held at the police station that they are "free to leave" at any time. *See, e.g.,* Tr. 182. Winston's affidavits flatly contradict defendants' claim. Despite Winston's repeated requests, Chicago police would not permit him to leave.

Winston Aff. ¶¶ 8–9; Winston Handwritten Aff. ¶¶ 1, 4–5; *see also* Davis Aff. ¶¶ 8–9. As Winston stated, "Several times I told the officers that I wanted to leave but they told me that I had to stay." Winston Handwritten Aff. ¶ 4. But this Court need not rely solely on such affidavits or, indeed, on the inferences drawn from common sense. During the last month two different panels of the Illinois Appellate Court for the First District have rejected as a "proposed fiction" the same kind of "free to leave" arguments by Chicago police and by the Cook County State's Attorney's Office that the same defendants advance in this case: *People v. Centeno,* 333 Ill.App.3d 604, 267 Ill.Dec. 257, 776 N.E.2d 629, 640, 2002 Ill.App. LEXIS 703, at *30 (2002) and *People v. Davis,* No. 1–00–0373, unpublished order (Aug. 12, 2002).

27. Both the evidence at the Hearing and cases such as those referred to in Finding 26 (and other cases cited there) call for one or both of the following inferences: (a) that the police are not credible when they claim that all witnesses are told they are free to leave and (b) that, even if some witnesses are so informed at times, as the police claim, the witnesses do not in fact perceive themselves to be voluntarily at the police station and do not actually believe that they are at liberty to leave the station at any time.

28. Those Finding 27 inferences flow first from the conditions in which witnesses are held for questioning. Pursuant to Chicago police detective division policy, witnesses at police headquarters are thoroughly searched upon their arrival and are then "secured" in small, typically windowless interrogation rooms that lack a toilet or running water. Tr. 185–87. Witnesses are "secured" in such rooms by locking the door. As a result, witnesses cannot go to the toilet without knocking on the interrogation room door, drawing the attention of

a police officer and obtaining an escort to the bathroom. Tr. 187–88. Witnesses get nothing to eat or to drink unless the interrogating officer purchases such items and makes them available. Tr. 194. There was evidence at the Hearing, uncontradicted by defendants, that on occasion witnesses are even placed in handcuffs. Tr. 300–301.

29. Finding 27's inferences also flow from the fact that witnesses typically remain at the police station in these conditions for extended periods of time:

    (a) Lt. Farrell acknowledged that the witness interrogation process takes "a long time" and can involve keeping the witness in the police station overnight. Tr. 150, 188.

    (b) FDLA presented evidence, uncontradicted by defendants, as to several witnesses who were held at the police station for lengthy periods of time—two who were held for over 24 hours and one, Aundre Miller, who was held at Area Two for 78 hours. Winston Aff. ¶¶ 1–2; Davis Aff. ¶¶ 1–2; Tr. 98, Tr. 98, 271–272, 353–55.

No reasonable person would knowingly volunteer to remain in a small, windowless, locked interrogation room for such extended periods of time. As *People v. Davis* (citations omitted) said in rejecting a like contention by the Chicago Police and the Cook County State's Attorney:

    According to the State, defendant stayed at the station for such a long time prior to his arrest because he was cooperative and agreed to remain to take a polygraph examination. However, the contention that defendant preferred to spend the evening on a steel bench in a locked interview room instead of at his grandmother's nearby home is without credence. Although the duration of a station stay is not always determinative of whether there was an illegal detention, the totality of the circumstances surrounding defendant's stay at the station indicates that he reasonably felt compelled to remain there.

    Defendant was the focus of the police investigation and was kept in a locked interview room that did not have a telephone, washroom or sleeping facilities. Further, the police never informed defendant that he was free to leave or offered an adequate explanation as to why he would agree to remain overnight.

30. Finding 27's inferences further flow from testimony concerning individual occasions on which police officers have informed FDLA attorneys that, although a client was in for questioning as a "witness," the client was *not* free to leave until the completion of the investigation. Tr. 280, 385.

31 It is self-evident that a person held in such conditions does not experience feelings of "rapport" and "personal bonding" with police interrogators. This Court finds to the contrary that such conditions are intended to and must in fact induce fear and desperation in a witness, thereby increasing the likelihood that the witness will give a statement even if to do so is contrary to his own best interests. As Lt. Farrell conceded in his testimony, the reason for isolating witnesses from friends and family, and for interrogating them in the unfamiliar setting of the police station, is to "overcome [their] reluctance" to cooperate with the police. Tr. 184–85.

32. In theory the police maintain a sharp distinction between "witnesses," who the police claim are "free to leave," and suspects, who are formally in custody, under arrest and may not leave the police station. As the foregoing Findings confirm, that pristine theory is totally at odds with actual practice. Even apart from the already-referred-to flat-out violations of

that theoretical construct, defendants themselves acknowledge that persons who come to the police station as "witnesses" may on occasion become suspects as an investigation proceeds. Tr. 179–80, 254–57. Hearing testimony referred to specific instances in which the status of an individual held at the police station has changed from "witness" to "suspect," and the reverse, from "suspect" to "witness." Tr. 281–84.

33. Because of the disparity between reality and the "proposed fiction" that defendants proffer, under which sharp distinctions are purportedly maintained between witnesses and suspects, it is of vital importance to a witness who is trying to decide whether he should cooperate to have the type of information that FDLA can and does provide as to the limits on police authority, including the fact that witnesses are not legally required to remain at the police station or to answer police questions.

### "Nature and Function" of Chicago Police Area Headquarters

34. As defendants acknowledge (see their Supplemental Response In Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunctive Relief at 5), police headquarters are routinely used, among other things, for the investigation of crimes, the detention and interrogation of suspects and the questioning of witnesses.

35. In the course of performing those functions, the police routinely and necessarily allow attorney access to police headquarters in at least the following circumstances:

(a) defense counsel, pursuant to Chicago Police General Order 92–05 (P.Ex. 2), are given access to suspects whom they seek to represent so long as counsel provide adequate identification;

(b) Assistant State's Attorneys are given access to witnesses being held at the police station to seek to obtain their statements (see Tr. 144); and

(c) Assistant State's Attorneys are also given access to suspects for the purpose of obtaining statements.

Pursuant to General Order 92–05, police are also called upon to allow outsiders to enter police headquarters and to speak with suspects as "visitors" of the alleged offender.

### Role of the State's Attorney

36. Cook County State's Attorney Devine's office operates a Felony Review Unit, the purpose of which is to assess whether it is appropriate to file felony charges as a result of investigations conducted by law enforcement agencies within Cook County. In the course of performing those responsibilities the State's Attorney's Felony Review Unit provides advice to the Chicago police concerning the rights of persons being held at Chicago police stations. Tr. 96–97.

37. On at least one occasion the supervisor of the State's Attorney's Felony Review Unit has advised Chicago police that they are not required to allow attorneys to have access to persons who are being held for questioning as witnesses. In denying FDLA attorneys such access on that occasion, police were acting on advice they had received from the State's Attorney's Felony Review Unit. Id.

38. More importantly in terms of policy and the need for injunctive relief, in this litigation the Cook County State's Attorney has independently argued the same unsound position urged by the other defendants here: that police act properly when they refuse contact between attorneys and witnesses at Chicago police stations and when they refuse even to inform such witnesses that an attorney is present seeking

to speak with them. *See, e.g.,* Devine's Objections and Response to Plaintiffs' Motion for Temporary Restraining Order at 9–12. That confirms that the instance referred to in Finding 37 was not an aberrant action by a misguided rogue Assistant State's Attorney, but was rather reflective of a misguided policy of that office itself. If not enjoined, the Cook County State's Attorney will continue wrongfully to advise police that they are legally entitled to deny access to attorneys seeking to meet with their client-witnesses at Chicago police stations. All of the foregoing Findings as to "defendants" ' policy and its illegality thus apply with equal force to the State's Attorney.

### No Legitimate Law Enforcement Need Justifies Defendants' Practices

39. Defendants presented evidence that their case clearance rate has decreased over the course of the past 20 years (Tr. 230–31; D.Ex. 1) in purported support of their claim that the practice described in Finding 15 is necessary for effective law enforcement. But that evidence did not establish, nor does it support a reasonable inference, that any reduction in the police case clearance rate is attributable to witnesses not having access to counsel. *See* Tr. 231–32, 248–49. Instead the only testimony in support of this claim consisted of anecdotal perceptions from two police officials that lawyer involvement has on occasion interfered with efforts to convince witnesses to cooperate voluntarily in police investigations. *See* Tr. 158–59, 249.

40. Such anecdotal testimony did not reliably establish a need for the practice described in Finding 15. Indeed, it is reasonable to infer instead that the practice of isolating witnesses in locked interrogation rooms, while denying them information that counsel is available to confer with them, does not cause witnesses to feel that they are being treated fairly. It is

axiomatic that people who perceive that they are treated fairly by the police are more likely to cooperate with the police in solving crime. *See, e.g.,* Tracey Meares, *Norms, Legitimacy and Law Enforcement,* 79 Oregon L.Rev. 391, 398–404 (2000). Hence it is fair to infer instead that defendants' practice may in fact be harmful to effective law enforcement, though such an inference is not needed to reach the Conclusions here.

41. Defendants' practice is also unnecessary, because even if police were properly to inform witnesses when lawyers were available to represent them, and if the lawyers might then advise the witnesses that voluntary cooperation is both risky and not required, the Hearing evidence established that the police would still have at least three means to secure witness assistance:

(a) Police could still persuade a counseled witness that cooperation would serve his own best interest and those of his friends and neighbors.

(b) Police could offer transactional or other immunity to the witness, thereby guaranteeing him that he would face no criminal jeopardy as a result of his cooperation. *See* Tr. 275–76.

(c) Police, with the cooperation of the State's Attorney, could compel a witness to testify before a grand jury about the matter under investigation. *See* Tr. 188–89, 193.

### CONCLUSIONS OF LAW

To obtain permanent injunctive relief, FDLA must first demonstrate actual success on the merits of its claim that defendants are violating its First Amendment right to associate and speak with client-witnesses who are being held at Chicago police stations. *See, e.g., Chicago Sch. Reform Bd. of Trs. v. Diversified Pharm.*

*Servs., Inc.*, 40 F.Supp.2d 987, 991 (N.D.Ill. 1999). This Court must also consider three other factors before it may enter an injunction:

    (a) whether FDLA has an adequate remedy at law and whether FDLA will suffer irreparable injury if an injunction is not issued;

    (b) whether the balance of harms between the parties favors issuing the injunction; and

    (c) whether issuance of an injunction will disserve the public interest. *Id.*

This Court has considered all of these factors and concludes that they all favor the issuance of an injunction in this case. Conclusions 1 through 37 deal with the first factor, while Conclusions 38 through 49 deal with the other three factors.

### Existence of Actionable Policies

■ 1. FDLA's claims are against City (a municipality) and the Cook County State's Attorney.[3] Thus FDLA's claims can succeed only if the violations it alleges are the result of policies, practices or customs of City and the State's Attorney. *See Monell v. Dept. of Soc. Servs. of the City of N.Y.*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Here City has not argued that the practice described in Finding 15 is anything other than a "permanent and well settled" practice to which it and its police now adhere and will continue to adhere unless enjoined by this Court. *See id.* at 691, 98 S.Ct. 2018; *see also* Answer ¶ 23 of Police Defendants to Complaint Count I. Although the Cook County State's Attorney denies that the policy described in Finding 15 also represents *his* policy, the record of this case—

importantly including the briefs submitted on behalf of the State's Attorney—makes clear that unless he is also enjoined the State's Attorney, as the final policymaker for the Cook County State's Attorney's Office, will continue as he has done to advise police, in furtherance of his own office policy, that the police practice is lawful. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 483–84, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Accordingly, all defendants' actions in this case reflect the policies of both City and the Cook County State's Attorney for the purposes of liability under 42 U.S.C. § 1983.

### FDLA's Standing to Sue

■ 2. It is uncontroverted that FDLA is regularly confronted with the Chicago police policy of denying access to client-witnesses. In light of the established nature of the policy and the ongoing character of FDLA's work, it is unquestionable that in the absence of injunctive relief granted by this Court FDLA will continue in the future to be injured by the implementation of defendants' policy. Accordingly FDLA has standing to seek such injunctive relief against defendants. Contrast *City of Los Angeles v. Lyons*, 461 U.S. 95, 105–10, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), holding that a plaintiff who *cannot* make a showing that his injury will likely recur does not have such standing.

### Younger Abstention Is Inappropriate Here

■ 3. Defendants argue that this Court should not exercise jurisdiction in this case pursuant to *Younger v. Harris*, 401 U.S. 37, 41, 91 S.Ct. 746, 27 L.Ed.2d

---

**3.** Initially claims were also brought against the individual City of Chicago defendants, both as individual capacity claims and official capacity claims. On March 19, 2002 the official capacity claims were dismissed as duplicative of the claim against City. Although the record includes no evidence of individual wrongdoing by those defendants outside of their official capacities, they have nonetheless taken the lead in defending City's position in this case.

669(1971), which holds that federal courts must abstain from enjoining ongoing state criminal proceedings. *Younger* doctrine has evolved to provide that absent extraordinary circumstances a federal court should abstain from exercising federal jurisdiction where three factors are present: (1) there are pending ongoing state judicial proceedings; (2) those proceedings implicate important state interests; and (3) those proceedings provide an adequate opportunity to raise constitutional challenges. *Trust & Inv. Advisers, Inc. v. Hogsett,* 43 F.3d 290, 295 (7th Cir.1994).

■ 4. *Younger* abstention does not apply in this case because there are no pending ongoing state judicial proceedings that could afford an "adequate opportunity" to raise the claim presented here: the right of FDLA *attorneys* to communicate with *possible witnesses* in a state criminal proceeding *that may be filed in the future.* Instead the only conceivable state forum in which FDLA attorneys could raise their First Amendment claim would be in a possible future state prosecution of a defendant against whom an FDLA client-witness might testify. Such a forum is plainly not one in which to raise the current First Amendment claim:

(a) FDLA would not even be a party in such a case. *Younger* does not require a person claiming a violation of his federal rights to search for possible state proceedings to which he is not a party but that he might somehow seek to join to obtain an adjudication of his claim. *Hoover v. Wagner,* 47 F.3d 845, 848 (7th Cir.1995); *see also Allen v. Allen,* 48 F.3d 259, 261 (7th Cir.1995) (*Younger* abstention extends "only to parties to ongoing state court litigation while specifically leaving non-parties free to pursue their claims").

(b) FDLA's First Amendment claim could not be litigated in a state

criminal proceeding in any event. If FDLA's First Amendment claim were upheld, the ruling would not bar the admission of any evidence in the state prosecution and certainly would not constitute a defense to the prosecution. In that respect FDLA's claims are analogous to the claim for denial of a prompt pretrial hearing raised in *Gerstein v. Pugh,* 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), where the Supreme Court had no difficulty in rejecting defendants' *Younger* abstention argument. As with FDLA's action here, the injunction the *Gerstein* plaintiff sought was "not directed at the state prosecutions as such, but only at ... an issue that could not be raised in defense of the criminal prosecution." *Id.* at 108 n. 9, 95 S.Ct. 854.

This Court therefore declines to abstain from hearing FDLA's First Amendment claim.

### Defendants' First Amendment Violation

■ 5. It is beyond dispute that there is a firmly established right of association between attorneys and persons they have been asked to represent. As *Denius v. Dunlap,* 209 F.3d 944, 954 (7th Cir.2000), *citing Bates v. State Bar of Ariz.,* 433 U.S. 350, 376 n. 32, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), put it, "the state cannot impede an individual's ability to consult with counsel on legal matters." Yet defendants do precisely that—and for the acknowledged purpose of keeping witnesses in the dark about FDLA's ability to assist them and about the specific content of FDLA's message.

■ 6. FDLA seeks to associate with its clients for purposes of communicating a message as to (a) the limits of police authority, (b) the circumstances under which

a citizen may decline to cooperate in a criminal investigation and (c) the application of those principles to the particular situations facing indigent, vulnerable citizens who have been placed in locked interrogation rooms in Chicago police stations. Those are matters of public importance for the purposes of First Amendment analysis.

7. *Pickering v. Bd. of Ed. of Township High Sch. Dist. 205*, 391 U.S. 563, 569–70, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) held that speech about the allocation of school funds between educational and athletic programs concerned a matter of public importance. *Rankin v. McPherson*, 483 U.S. 378, 384–87, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) concluded that a private office conversation between two government employees about the policies of the President's administration constituted speech on a matter of public importance. And *Bartnicki v. Vopper*, 532 U.S. 514, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001) held that a private telephone conversation about a collective bargaining negotiation also constituted speech on a matter of public importance. By parity of reasoning (or perhaps even a fortiori), any face-to-face discussion between an attorney and his or her client about the constitutional rights and duties of an individual and the limits of police investigative authority, especially in the context of a matter of such critical importance to the client-witness, is also speech on a matter of public importance.

8. Because FDLA seeks to engage in constitutionally protected speech with its clients, its expressive and associational rights are entitled to a particularly high degree of First Amendment protection. Speech on the issues at stake for its client-witnesses "occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), *quoting*

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982). FDLA attorneys, like other attorneys who associate with their clients for the purpose of advancing political beliefs and constitutional rights rather than purely private or commercial aims, hold special First Amendment status. *See In re Primus*, 436 U.S. 412, 424, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978); *NAACP v. Button*, 371 U.S. 415, 429–30, 83 S.Ct. 328, 9 L.Ed.2d 405 (1962) (the right of lawyers and clients "to engage in association for the advancement of beliefs and ideas" is a fundamental right protected by the First Amendment).

9. This case's record makes it abundantly clear (*see* Findings 15 to 25) that defendants, even while they subject witnesses to their own indoctrination concerning the perceived importance of cooperating with the authorities and even while they also allow access to persons who support witness cooperation with police investigations, refuse even to inform witnesses—persons who they say are not suspects and who are theoretically there voluntarily—that an FDLA attorney is at the police station and is available to consult with them. Defendants' stated objective for that policy and procedure is to maintain the *ignorance* of FDLA's witness-clients as to FDLA's message and FDLA's availability to assist them. That is a crass form of governmental paternalism entirely at odds with the First Amendment.

10. Even in the context of commercial advertising, the Supreme Court has repeatedly emphasized that the First Amendment forbids the government's denial of access to information because it does not want people to make decisions they might make if they were fully informed. *See, e.g., Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council,*

425 U.S. 748, 769–70, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); Justice Stevens' opinion in *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 503, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) ("The First Amendment teaches us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good").

11. If paternalistic suppression of information is impermissible in the context of commercial speech, it is all the more to be feared where, as in this case, the speech in issue concerns matters of such fundamental importance. After all, the issue here is not whether an individual should buy one brand of toothpaste or another but rather how he should resolve, in an often highly intimidating atmosphere, a potentially profound conflict between his responsibilities as a person and his personal interests as an individual. For the government willfully to preclude a conversation between an attorney and a client in such circumstances—and to do so for purposes of manipulating the individual's decision-making to the government's own advantage—is unconscionable.

12. Police stationhouses are not of course generally accessible to the public at large, and the police may in appropriate circumstances exclude members of the public from their premises. But they may only do so if their exclusions—unlike the exclusion of plaintiff in this case—are *viewpoint-neutral. See Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 49, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983); *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,* 473 U.S. 788, 806, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). Our Court of Appeals has repeatedly held that government agencies may not employ political or other viewpoint-based criteria to decide who may gain access to their facilities and on what terms. *See Chicago ACORN, SEIU Local No. 880 v. Metropol-*itan Pier & Exposition Auth., 150 F.3d 695, 700, 704 (7th Cir.1998); *Grossbaum v. Indianapolis–Marion County Bldg. Auth.,* 63 F.3d 581, 587 (7th Cir.1995). Defendants violate that fundamental principle when they exclude FDLA from police stations *because of what they fear its attorneys might say.*

13. Defendants claim that their exclusion of FDLA is justified by their interest in law enforcement: Because witness cooperation is often important in solving crimes and because FDLA's attorneys may advise witnesses that they have the right not to cooperate with police, defendants say that some crimes will consequently go unsolved. Even apart from its limited anecdotal scope and its primarily ipse dixit nature, that argument cannot bear the exacting scrutiny that must be applied when the government engages, as here, in viewpoint-based suppression of First Amendment activity on matters of such importance.

14. FDLA seeks to associate with its witness-clients for one reason: to convey truthfully and fully to the witnesses that they are under no legal obligation to speak with police and that they may (and should) cease cooperating *if their own interests might be adversely affected.* Defendants do not and cannot dispute that this message correctly states the witnesses' rights under our law.

15. Nor can defendants claim that FDLA's message lacks importance either for the recipient or for our society. Witnesses with whom plaintiff seeks to associate have been isolated from family and friends with the specific goal of overcoming their reluctance to speak with police. They are poor. They are often intimidated, vulnerable and ignorant of their rights. Sometimes they enter the police station as witnesses, only later to face arrest and charges as the investigation proceeds.

And too often, as the evidence and caselaw establishes, their purported status as witnesses who are held voluntarily and are free to leave is used by the police as a pretext for the violation of the constitutional rights of the persons held. It is not that the adoption and implementation of the policy itself violates those constitutional rights in that respect—it is rather that the existence of the policy so readily facilitates such pretextual conduct by the police.

16. At its core the First Amendment prohibits "government from proscribing speech ... because of disapproval of the ideas expressed." *R.A.V. v. City of St. Paul,* 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (citations omitted). "[D]iscrimination against speech because of its message" is presumptively impermissible under the First Amendment. *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 828, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). This case presents a clear example of unconstitutional viewpoint discrimination. On the record here, if the police believe that a person wants to see a witness to help the police persuade him to disclose information about himself or others, the police will warmly welcome that person in. But if a lawyer is there to inform the witness of his legal and constitutional rights, the police shut the door. Such conduct is anathematic to the First Amendment.

17. FDLA does not in any way advocate or advise unlawful conduct. To the contrary, its message is a truthful, lawful and important one about the rights of individuals and the limits of law enforcement power. No authority justifies the suppression of so fundamental a message for the bald reason that defendants would prefer that the witnesses not hear it.

18. Defendants nevertheless argue unpersuasively that their exclusion of FDLA lawyers from access to witnesses at police stations is a viewpoint-neutral protection of the witnesses from any and all outside influences. That contention flies in the face of the Hearing evidence, which shows (a) that Assistant State's Attorneys—outsiders to the police station environment, though they work in law enforcement—are routinely permitted to meet with witnesses and (b) that other outsiders (a "brother, friend or pastor" of the witness) would also be permitted to speak with the witness "if it will keep [the witness] there and keep [him] cooperating." Tr. 144, 236–37.

19. By contrast, the Hearing evidence showed that defendants bar FDLA from access to its witness-clients in "an effort to suppress expression merely because [the defendants] oppose [FDLA's] view." *Perry Educ. Ass'n,* 460 U.S. at 46, 103 S.Ct. 948. As the foregoing Conclusions make clear, such viewpoint-based denials of access can never be justified based upon the non-public character of the Chicago police area headquarters. *See id.; Cornelius,* 473 U.S. at 806, 105 S.Ct. 3439.

20. But even if defendants' position— that their exclusion of FDLA from contact with client-witnesses in police stations is somehow a viewpoint neutral exclusion— were to be credited despite its lack of foundation, defendants would still have to show that the exclusion is a "reasonable" restriction on access in light of "the characteristic nature and function" of the police station. *United States v. Kokinda,* 497 U.S. 720, 732, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) (O'Connor, J., plurality opinion); *Cornelius,* 473 U.S. at 806, 105 S.Ct. 3439. Defendants have not done that. Even if somehow viewed as viewpoint-neutral, defendants' exclusion of FDLA is *unreasonable,* and this Court must find even in that event that defendants violate FDLA's First Amendment rights.

21. On the other side of the coin, it is equally beyond question that a witness at

the police station has a "right to hire and consult an attorney [that] is protected by the First Amendment's guarantee of freedom of speech, association, and petition." *Denius,* 209 F.3d at 953–54. As these Conclusions have made clear, FDLA has a correlative right to associate with its clients to further FDLA's organizational mission: the social goal of affording protection to indigents in police custody. That right has been validated in *NAACP v. Button,* 371 U.S. at 430, 439, 83 S.Ct. 328, and revalidated by *Primus,* 436 U.S. at 424, 98 S.Ct. 1893, and it is no less strong today.

22. Wholly at odds with the policy of the Chicago police to deny access to FDLA where the police claim the witness is neither a target nor a suspect, the police practice is to afford access at Area headquarters to other attorneys with specific professional responsibilities to discharge on the premises. Assistant State's Attorneys enter the premises to get statements from suspects and witnesses and to approve felony charges. Defense lawyers who represent suspects who are in custody routinely enter the police premises to meet with their clients. Indeed, Area headquarters have been *designed* with interview rooms that can accommodate private interviews between attorneys and persons the police are holding there. Like the Assistant State's Attorneys and the defense counsel for suspects, FDLA also has a professional responsibility to discharge on police premises.

23. When an FDLA attorney appears at Chicago Police Area Headquarters to speak with a witness, it is because the attorney has been specifically retained by a family member or friend to assist that person. In those instances the FDLA attorney informs police personnel at the station that he or she has been retained to represent a specific person and requests the opportunity to speak with the witness.

In such circumstances the police must accept the FDLA attorney's assertion that he or she represents the witness until the contrary is proved. *See, e.g., People v. McCauley,* 228 Ill.App.3d 893, 898, 172 Ill. Dec. 222, 595 N.E.2d 583 (1992), *rev'd in part on other grounds but reaffirming the same principle,* 163 Ill.2d 414, 206 Ill.Dec. 671, 645 N.E.2d 923 (1994) ("Moreover, when an attorney reasonably identifies himself and reasonably informs the police that he represents a suspect in custody, the police have no entitlement to make their own on the spot determination that the attorney does not lawfully represent the suspect. The purview for making that determination is plainly outside the bounds of the police"); *accord, People v. Smith,* 220 Ill.App.3d 678, 685, 163 Ill.Dec. 129, 581 N.E.2d 80 (1991) (the relevant inquiry into whether an attorney may gain access to a client is not "whether defendant must have personally retained the lawyer or directed that the lawyer be retained.... It is enough that a lawyer is present, claims to have been engaged to represent the defendant and seeks access to him").

24. Because the police must thus accept the representation of an FDLA attorney that he or she has been asked to represent a witness, it follows that the defendants cannot reasonably bar the FDLA attorney from access to such witnesses. And that is particularly so here, where according to defendants themselves the witness is purportedly free to leave. Such access could be accomplished either by permitting the FDLA attorney to enter and confer with the witness in the police station or simply by allowing the witness to walk outside the station to confer with counsel.

25. Defendants are also incorrect in arguing that the recognition of FDLA's right to gain access to witnesses at the police station would be tantamount to recognizing

a universal right of all citizens to have such access. FDLA stands on a different footing from the public at large, because its attorneys have been asked to provide legal representation to the witnesses. FDLA has specific fiduciary responsibilities to persons it has been asked to represent—duties that must be discharged at the time that the police seek to question its clients. Hence a simple and principled line can be drawn based on the distinction between FDLA, which has those special responsibilities, and a member of the general public, who does not.

26. Neither *Ukrainian–Am. Bar Ass'n, Inc. v. Baker*, 893 F.2d 1374 (D.C.Cir.1990) nor *Haitian Refugee Ctr., Inc. v. Baker*, 953 F.2d 1498 (11th Cir. 1992) (per curiam), is authority to the contrary. Instead *Ukrainian Bar Ass'n* expressly reconfirms the *Primus* principle that the First Amendment entitles attorneys to associate with prospective clients (and, *a fortiori*, with actual clients) "free from governmental interference." 893 F.2d at 1381. *Ukrainian Bar Ass'n* did hold that the First Amendment does not entitle lawyers to affirmative governmental assistance in communicating their message to seek potential clients. But FDLA—which seeks only to communicate with specific persons it has been asked to represent—requests no such affirmative assistance. *Haitian Refugee Ctr.*, which involved aliens detained in government custody outside the United States, is also wholly inapropos as a barrier to FDLA's First Amendment claim.

27. As indicated earlier, defendants contend that it is reasonable to bar contact between FDLA and its witness-clients because allowing such contact in the police station would (1) interfere with the "rapport and trust" between an interrogating officer and the witness, (2) give the witness a concern that others (potentially associated with the offender) know the witness is cooperating with the police, (3) cause the witness to opt not to get involved with the investigation or (4) because FDLA is a legal services organization, cause the witness to fear that he might be a target of the investigation. *See* Supplemental Response of Defendants in Opposition to Plaintiffs' Motion for Temporary Restraining Order and for Emergency Injunctive Relief at 6. All of those purported justifications tend improperly to sanitize the real world circumstances of the police interrogation of FDLA's client witnesses. Evidence during the Hearing made clear that the witnesses are deliberately placed in a highly coercive environment in an effort to break their will and ensure their cooperation. They are held incommunicado in isolation in small, windowless, locked rooms where they may remain for extended periods of time. Defendants' goal is to isolate them from their lawyers and from any other outside source that might inform them of their right not to cooperate.

28. It is no less than appalling for defendants to seek to justify their imposition of such isolation—so inimical to basic First Amendment values—by appealing to the police right to enforce "reasonable" limitations upon outsider access to police headquarters. It is inconceivable that the goals of law enforcement require the government to keep such individuals in the dark about their rights. And even if the goals of law enforcement did "require" this, it would nonetheless be unconstitutional. *Cf. Escobedo v. Illinois*, 378 U.S. 478, 490, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) ("If the exercise of constitutional rights will thwart the effectiveness of a system of law enforcement, then there is something very wrong with the system.")

29. As Justice Stevens has observed in *44 Liquormart*, 517 U.S. at 503, 116 S.Ct. 1495, "[t]he First Amendment teaches us to be especially skeptical of regulations

that seek to keep people in the dark. . . ." Defendants' unquestioned purpose here is precisely that: to keep witnesses "in the dark" and to keep them unaware of what they misleadingly label as dangerous "outside influences," such as the availability of a lawyer. With that reality in mind, these Conclusions turn to the four claimed justifications offered by defendants.

30. First among the purported justifications—that denial of access is a reasonable means to prevent interference with "rapport and trust" between the interrogator and the witness—is only a euphemistic way of asserting that defendants do not want the witnesses to know the information that FDLA has to offer concerning the witnesses' legal rights. It is abundantly clear from the Hearing testimony that the police relationship with witnesses at the police station is premised on the witnesses remaining ignorant of the fact that they have the option simply to leave the station and decline further cooperation. Thus, when defendants say that they want to maintain "rapport" with witnesses whom they have placed in locked interrogation rooms, the obvious meaning is that they wish the witnesses to remain ignorant of their option not to cooperate.

31. Moreover, defendants' claim that they wish to maintain "rapport" with witnesses they are holding in the police station flies in the face of common sense. It is hardly conducive to "rapport" to lock a person in a small, windowless room for hours or days on end—the treatment that defendants concede they give to such witnesses. And as already set out, the Illinois Appellate Court shares this Court's recognition of the fiction inherent in defendants' portrayal of such long-term treatment as "voluntary" on the witness' part. Surely that approach does not foster trust or confidence. Common sense suggests that defendants' methods instead develop fear and desperation in witnesses who have been isolated from friends and family. But even in the seemingly unlikely event that any true "rapport" has developed between the police and a witness who has been locked in an interrogation room, that "rapport" would not be undermined (indeed, it could well be fostered) by a brief interruption to inform the witness that a lawyer is present and available to consult with him.

32. Defendants' second purported justification is that permitting FDLA attorneys access to witnesses might serve to instill fear in the witnesses that persons associated with the offender are aware of the witnesses' cooperation and are seeking to silence them. There is no record support for this contention. Evidence at the Hearing showed instead that FDLA is asked to provide representation by family members or friends of the witness. There is no basis for the suggestion that FDLA has engaged, or ever would engage, in improper intimidation tactics on behalf of a wrongdoer. Nor is there a shred of record evidence that FDLA has ever unwittingly filled such a role. This Court rejects the unfounded suggestion that FDLA could reasonably be denied access to witnesses in police stations for that reason.

33. Defendants' third and fourth purported justifications—that contact with FDLA attorneys might cause a witness (a) not to get involved in an investigation or (b) to believe that he is a target of the investigation—are simply candid expressions of defendants' true purpose. Defendants plainly fear that FDLA would inform witnesses of their undisputed right to terminate cooperation and that FDLA might also inform witnesses that cooperation could lead to their becoming suspects themselves (see, e.g., Finding 20). For reasons already expressed, defendants' desire to suppress FDLA's point of view

cannot survive scrutiny under the First Amendment.

34. Defendants also argue that recognizing FDLA's First Amendment right to associate with its witness-clients would "circumvent" the "entire body of law" created in the wake of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and *Dickerson v. United States,* 530 U.S. 428, 438, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). In that respect defendants contend that because persons in police stations who are not in custody do not have Fifth Amendment protections under *Miranda,* it follows that the First Amendment cannot afford a witness the right to associate with counsel (or, for purposes of this case, that the First Amendment somehow cannot cover counsel's correlative right to associate with the witness). No authority that the defendants have cited supports that contention. Instead the argument flouts a host of decisions recognizing that a plaintiff may properly state a First Amendment claim in circumstances where claims under other Bill of Rights provisions fail. *See, e.g., Babcock v. White,* 102 F.3d 267, 274–76 (7th Cir.1996), rejecting plaintiff's Fifth and Eighth Amendment claims but upholding his First Amendment claim. This Court flatly rejects defendants' conceptually unsound position.

35. No analytical difficulty or violation of principle is involved in recognizing a broader First Amendment right of association between witnesses and their lawyers than the right to counsel that *Miranda* and its progeny confer on suspects under the Fifth Amendment.[4] Witnesses do not stand on the same footing as suspects. Witnesses are voluntarily at the police station and may leave at any time. Their rights of association with counsel are the rights that belong to all free persons. Suspects, in contrast, have the protections articulated by *Miranda* and *Dickerson* because suspects are *not* free and may *not* leave the stationhouse. Having lost their freedom, suspects are afforded a special set of protections under the Fifth Amendment. For example, under *Miranda* suspects must be warned specifically of their rights before they are questioned; when suspects invoke their right to counsel, questioning must cease; a lawyer must be provided free of charge to a suspect; and the lawyer must be present if the police wish to recommence questioning. Those protections are not afforded to witnesses.

36. It is true that *Moran v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) holds that the Fifth Amendment rights of a suspect in custody are not violated by a failure to inform him that a lawyer is present in the police station and seeking to speak with him.[5] But even apart from the fact that the context in which *Moran* presented that problem did not implicate the very different First Amendment issue posed here, so that no negative inference should be drawn in this case from that decision, it may well be that the First Amendment rights of persons in the context at issue here enjoy a greater breadth than those of persons in custody. There are obviously many respects in which the expressive and associational freedoms of free persons—a category that embraces mere witnesses, who are free by definition—are greater than those of suspects in custody.

---

4. In like fashion, the Sixth Amendment right to counsel after indictment did not preclude the Supreme Court in *Miranda* from recognizing a Fifth Amendment right to counsel during interrogation *before* indictment.

5. In that respect the Illinois Constitution provides a broader scope of the right to counsel. Contrast *Moran* and *People v. McCauley,* 228 Ill.App.3d 893, 172 Ill.Dec. 222, 595 N.E.2d 583 (1992).

37. In sum, this Court rejects defendants' argument that the Fifth Amendment precludes recognition of the First Amendment rights of FDLA and its witness-clients. Together with all that has gone before, that reconfirms FDLA's actual success on the merits of its First Amendment claim.

■ 38. Because this Court has thus found that FDLA has demonstrated a First Amendment violation by virtue of defendants' refusal to permit FDLA access to witness-clients in police stations, it follows that the injury is an irreparable one that is not fully compensable through an award of money damages. *See Nat'l People's Action v. Village of Wilmette*, 914 F.2d 1008, 1013 (7th Cir.1990). FDLA therefore has no adequate remedy at law.

39. It is also clear, and this Court concludes, that FDLA suffers an irreparable injury as a result of the First Amendment violation in issue here. As Justice Brennan's plurality opinion in *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) said, the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Accord, Nat'l People's Action*, 914 F.2d at 1013 and cases cited there.

40. Next, the balance of harms between the parties strongly favors the entry of an injunction. Conclusions 41 to 45 address that balance—or more accurately, that major imbalance.

41. Whenever constitutional rights are flouted, as the defendants do here, by definition there is a serious and substantial harm to the injured party. But FDLA also presented evidence of a specific injury in light of its particular mission to educate the public concerning the *efficacy* for indigent citizens of asserting one's constitutional entitlements. As FDLA's Executive Director Bowden explained, the Chicago police's and the State's Attorney's refusals to honor FDLA's constitutional right to associate with its clients undermine FDLA's credibility with the very people the agency was organized to serve. By such refusals the police and the State's Attorney—not the Constitution—impermissibly become the arbiters of the rights of FDLA's clients. FDLA's message is sullied and made to seem irrelevant. And contrary to defendants' less-than-specious arguments, the magnitude of that injury cannot be measured by the number of hotline calls FDLA may continue to receive.

42. In contrast, any arguable harm to defendants from the entry of an injunction would be minimal by comparison. Defendants contend that their ability to solve crimes would be prejudiced if injunctive relief were awarded. They point to the importance of witness cooperation in solving crimes and claim that if witnesses in police stations were informed when lawyers were present and available to advise the witnesses, it would result in fewer witnesses agreeing to cooperate with the police, leading to a reduction in the police clearance rate for crimes. Even were that true (and defendants have offered nothing but conjecture—rather than evidence—to support that proposition), any such claimed harm cannot even approach outweighing the constitutional and related injuries described in Conclusions 38, 39 and 41.

43. First, defendants have no colorable claim of entitlement to violate the Constitution simply to increase their case clearance rate. Hence, any claimed harm sustainable by defendants by reason of advising witnesses in police interview rooms of the presence of a lawyer who is available to advise them should not weigh in the balance in determining whether to grant injunctive relief. *See WRMA Broad. Co. v. Hawthorne*, 365 F.Supp. 577, 582 (M.D.Ala.1973).

44. Second, even if the claimed harm were to be placed on the balance scales, the defendants have not shown that it is substantial. They presented evidence that their case clearance rate has decreased over the course of the past 20 years (Tr. 230–31; D.Ex. 1), but they offered no statistical or other creditable proof that the reduction in case clearance is attributable to witnesses having access to counsel. *See* Tr. 231–32, 248–49. All that they tendered instead were anecdotal perceptions from two police officials that lawyer involvement has on occasion interfered with efforts to convince witnesses to cooperate voluntarily in police investigations. *See* Tr. 158–59, 249. In contrast, a host of studies on procedural justice support the common sense notion that when people perceive that they are treated unfairly by the police, they are less likely to cooperate with law enforcement to solve crime. *See, e.g.,* the Tracey L. Meares article cited in Finding 40. Thus any marginal consequences of the challenged practice—and nothing supports the notion that it would be more than marginal—might well reduce rather than increase Chicago police effectiveness in solving crime.

45. Moreover, any possible harm of the type claimed by defendants would be tempered materially by other means available to defendants. If the police did inform witnesses when lawyers were available to represent them, and even if the lawyers might advise the witnesses that voluntary cooperation is both risky and not required, the police would still have at least three means to secure witness assistance:

(a) They could seek to persuade a counseled witness that cooperation would serve his own best interest and those of his friends and neighbors. That approach would be consistent with the First Amendment principle that free information encourages rational decisionmaking on the part of individuals.

(b) They could offer transactional or other immunity to the witness, thereby guaranteeing him that he would face no criminal jeopardy as a result of his cooperation. *See* Tr. 275–76.

(c) With the cooperation of the State's Attorney, they could compel a witness to testify before a grand jury about the matter under investigation. *See* Tr. 188–89, 193.

46. In sum, as forecast in Conclusion 40, the speculative nature of defendants' proof as to any purported adverse effect on law enforcement of an injunction, coupled with the alternatives available to encourage witness cooperation, make it clear that the claimed harm to defendants—even if it were appropriately weighed in the balance—is dwarfed by the harm caused to FDLA by the continuing violation of its First Amendment rights.

47. Last among the factors entering into the injunctive relief determination is whether granting such relief would serve or disserve the public interest. In the generic sense, the public has a strong interest in the protection of constitutional rights that a court should weigh in the balance in deciding whether to award an injunctive remedy. *See, e.g., Lujan v. Defenders of Wildlife,* 504 U.S. 555, 576, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (articulating "the public interest in Government observance of the Constitution and laws").

48. In the more particularized sense identified in *Roland Mach. Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 388 (7th Cir. 1984), a Court should also consider the effect an injunction would have on persons who are not parties to the litigation. *Accord, Cooper v. Bombela,* 34 F.Supp.2d 693, 701 (N.D.Ill.1999). In this case the rights of the witnesses themselves must be taken into account in reaching the final balance. There can be no question that

those vulnerable persons would also be served by the entry of an injunction. Witnesses in police stations are isolated from friends and family and placed in an inherently intimidating environment. They are often at risk of becoming suspects. They have every right to consult a lawyer, plus a strong interest, given their circumstances, in doing so. If an injunction were not issued, those non-litigants will continue to be adversely affected.

49. This Court therefore concludes that the public interest would be served, and in no way disserved, by the entry of an injunction. Hence the last piece of the mosaic calling for injunctive relief has been put into place.

\* \* \* \* \* \*

Based upon the foregoing Findings and Conclusions, this Court now enters the following permanent injunction:

All defendants, their respective officers, agents, servants, employees and attorneys and all others acting in active concert or participation with any of the foregoing are permanently enjoined and restrained as follows:

1. When an attorney appears at a Chicago police station and informs the police that he or she represents a person whom the police have present at the station (hereinafter referred to, purely for convenience, as being "held" at the station) and whom the police assert they consider to be a witness, the police shall take no action to interfere with the First Amendment rights of association between the attorney and the person being held.

2. In addition, the police shall immediately inform the person being held that an attorney is present seeking to counsel him and shall ascertain from the person being held whether he or she wishes to consult with the attorney.

3. To implement the foregoing provisions, the police shall permit the attorney to be present when the information required by Paragraph 2 is conveyed to the person being held, so that the attorney may verify that the person being held has in fact been provided with the information.

4. In the event the person being held states that he or she wishes to consult with the attorney, the defendants shall take no action to interfere with any private consultations that the attorney and the person being held wish to hold.

5. Cook County State's Attorney Devine shall promptly conduct a training session, to be repeated at reasonable intervals, to apprise all of his Assistants involved in the handling of criminal investigations and prosecutions of the terms of this order and of its underlying Findings and Conclusions. During the next 30 days (and thus possibly before the first such training session), the State's Attorney shall distribute to all such Assistants a directive apprising them of this order and of its underlying Findings and Conclusions.

6. City of Chicago shall take all steps necessary to assure the effective implementation of this order by its Police Department and its personnel.

7. Copies of this order shall promptly be furnished to all Area Commanders, all watch commanders and all front desk personnel in all Chicago police area headquarters and police district stations. Copies of this order and of the underlying Findings and Conclusions shall also be furnished forthwith to all Assistant Cook County State's Attorneys working in the Felony Review Unit. Thereafter all such Assistants, and any other Assistants working with police, shall instruct the police (and shall respond to all inquiries from the police) in accordance with this order and those Findings and Conclusions.

8. This permanent injunction is the final judgment order in this action.