In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 02-3376 & 02-3389

FIRST DEFENSE LEGAL AID,

*Plaintiff-Appellee*,

*v.*

CITY OF CHICAGO, *et al.*,

*Defendants-Appellants*.

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 01 C 9671—**Milton I. Shadur**, *Judge*.

ARGUED DECEMBER 11, 2002—DECIDED FEBRUARY 19, 2003

Before COFFEY, EASTERBROOK, and DIANE P. WOOD, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. According to *Moran v. Burbine*, 475 U.S. 412 (1986), a suspect in police custody does not have a constitutional right to be notified that his attorney is at the stationhouse. The Constitution permits the suspect to request counsel and stop the interrogation but does not require notice about the lawyer's whereabouts. Chicago applies to cooperating witnesses the approach sustained in *Moran* for custodial interrogation: Witnesses are not notified of attorneys' presence and undergo interrogation without legal advice unless they request access to counsel. The district judge found, after a trial, that "[w]hen a spontaneous request *is* made by a

witness, the police attempt to discourage the contact, telling the witness either that he does not need a lawyer or that it is better if fewer people know he is at the station, or both. Only if the witness nonetheless 'insists' on counsel will he be permitted to communicate with an attorney." 225 F. Supp. 2d 870, 875 (N.D. Ill. 2002) (emphasis in original; internal citations omitted). The district court held that this practice is unconstitutional and issued a permanent injunction requiring the City (and the State's Attorney for Cook County) to notify a witness as soon as an attorney arrives purporting to represent him; the injunction also compels the police to admit the attorney so that the notice must be given in his presence, and he may confer in confidence with the witness. 225 F. Supp. 2d at 892-93. In light of *Moran*, this holding was not based on a theory that the City's practice violates the witness' rights; instead, the district court found, the practice violates *the attorney's* right under the first amendment (applied to the states through the fourteenth) to associate with his client. We stayed the injunction and expedited the appeal.

One immediate obstacle to this approach is the fact that the interior of a police station is not a public forum. The Constitution does not create either a right of access to the inside of governmental buildings, see *Houchins v. KQED, Inc.*, 438 U.S. 1 (1978), or an obligation to offer a message-delivery service for the benefit of those who arrive at the door. See *Thornburgh v. Abbott*, 490 U.S. 401 (1989). Plaintiff First Defense, a legal-aid bureau that offers free assistance to persons associated with crime (either as suspects or as witnesses), concedes that there is no general right of access but contends that it possesses special rights of association with its clients. The idea appears to be that if the witness cannot come out, then the lawyer must be let in. How far this line of argument goes to establish rights to visit inmates in prison is a question now before the Supreme Court. See *Bazzetta v.*

*McGinnis*, 286 F.3d 311 (6th Cir. 2002), cert. granted under the name *Overton v. Bazzetta*, No. 02-94 (U.S. Dec. 2, 2002). It is hard to reconcile this contention with *Moran*, for suspects are not free to come out yet need not be notified of counsel's arrival. Witnesses present an easier situation, for they are entitled to leave the police station and meet their attorneys outside (or anywhere else).

What is more, the district court's injunction extends beyond the attorney-client relation to require the police to admit attorneys who have not yet been engaged as counsel. This is why we referred to attorneys "purporting to" represent a witness; the injunction does not permit the police to determine whether a given attorney actually represents a given witness. The district court found that First Defense generally enters the picture at the request of witnesses' family or friends. The judge stated without elaboration that "[t]hose requests suffice to create an attorney-client relationship between the FDLA attorney and the person being held." 225 F. Supp. 2d at 873. It is hard to see how this can be so; an attorney is an agent, and there can be no agency without the knowledge and consent of a principal. It takes two to associate; a one-sided *desire* to counsel a witness does not create a protected "right of association." Neither First Defense nor the district court has drawn to our attention any statute or opinion providing that requests by third parties create attorney-client relations in Illinois. The district judge did cite decisions prohibiting police from looking behind a claim of representation—"the police must accept the FDLA attorney's assertion that he or she represents the witness until the contrary is proved. *See, e.g., People v. McCauley*, 228 Ill. App. 3d 893, 898, 595 N.E.2d 583 (1st Dist. 1992), *rev'd in part on other grounds but reaffirming the same principle*, 163 Ill.2d 414, 645 N.E.2d 923 (1994) ("Moreover, when an attorney reasonably identifies himself and reasonably informs the police that he represents a

suspect in custody, the police have no entitlement to make their own on the spot determination that the attorney does not lawfully represent the suspect. The purview for making that determination is plainly outside the bounds of the police")", 225 F. Supp. 2d at 886—but neither *McCauley* nor any other case we could find concludes that an attorney's say-so, or a friend's invitation, actually creates an attorney-client relation.

Sometimes a family member may act as next friend on behalf of a person unable to protect his own interests, but "friends" (the district court's opinion supplies no details about who these may be) differs from "next friends." Two courts of appeals recently have held that persons in custody must select counsel for themselves; volunteers and friends may not form an attorney-client relation on behalf of persons in custody. *Coalition of Clergy, Lawyers & Professors v. Bush*, 310 F.3d 1153 (9th Cir. 2002); *Hamdi v. Rumsfeld*, 294 F.3d 598 (4th Cir. 2002). See also *Whitmore v. Arkansas*, 495 U.S. 149 (1990); *Graham v. Lappin*, 255 F.3d 906 (7th Cir. 2001). Friends may be particularly poor champions of witnesses, for professed "friends" could be the very persons under investigation. Police and witnesses alike know that criminal organizations often retaliate against those who assist law enforcement. A legal rule entitling "friends" to send lawyers to police stations, and compelling the police to admit them, could help these criminals determine who within the organization has switched sides, with potentially fatal results—for attorneys acting in the best of faith may enable the "friend" to learn that a particular person has provided information to the police. Cf. *United States v. Aguilar*, 515 U.S. 593 (1995) (prosecution of a federal judge for alerting a suspect to an investigation). Worse: although the district judge found that First Defense is above board, not all attorneys are honest. Some set out to assist criminal organizations, and the police thus may

be right to counsel witnesses that the fewer people who know of their presence at the stationhouse, the better for their safety.

Nonetheless, because some of First Defense's requests may come directly from the witnesses (before they enter the stationhouse), we must consider what access an attorney may obtain after a *bona fide* attorney-client relation has been formed. First Defense contends that it has a preferred right of access—one greater than the press, which First Defense acknowledges lacks a legal entitlement to enter police stations—in large measure because Chicago's police mistreat witnesses. The district court agreed with this submission, finding that the police lock witnesses into Spartan rooms, sometimes holding them overnight against their will—and rarely informing the witnesses that they are free to leave. Yet no such advice is required by existing statutes or the Supreme Court's opinions: if a witness has turned into a suspect being held under custodial interrogation, then the witness is *not* free to leave (though *Miranda* warnings become essential); and if the witness is not in custody, then no advice of rights is needed. See *Ohio v. Robinette*, 519 U.S. 33 (1996). See also, e.g., *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973); *Rogers v. Richmond*, 365 U.S. 534 (1961). What First Defense really wants to do is to counteract decisions such as *Robinette* and *Schneckloth* by gaining entry in order to deliver the advice that it thinks the police should have given. But if the police are violating the rights of some witnesses by holding them against their will, the right response is to award damages *to the witnesses* (or suppress evidence if the witness becomes a defendant and the prosecutor seeks to use the statement against him). When A's rights are violated, the remedy runs to A; a court does not create some new constitutional right and award it to B. Yet that is First Defense's theme: that because the police violate some witnesses' rights, then

lawyers receive extra constitutional rights. Not so. Each group enforces its own entitlements.

First Defense and the district court express concern that police "invite" to the station persons they suspect of crime but lack the evidence to charge with offenses, ask these persons for information, and keep them cooped up because they, not being formally in custody, do not receive either *Miranda* warnings or direct notice that they are free to leave. Some of these persons know that they can leave but will be too timorous, or cowed by authority, to invoke this right; others may think themselves to be in custody (and behave as if they were) even though the police would honor a demand for liberty. Many of the witnesses incriminate themselves as well as (or instead of) third parties, and if prosecutors elect to charge them with crimes rather than reward them for assistance, they cannot invoke *Miranda* or any equivalent when seeking suppression of their statements. Whether something (an exclusionary rule, an entitlement to damages, or a new norm of police conduct) should be done about this—legislatively, through the state judiciary, or as a matter of federal constitutional law—is not presented today, given that no witness is a party. First Defense is asserting its own rights, and to ascertain them we must ask how the police must deal with lawyers for suspects whose rights have been respected—for this injunction requires the police to notify *any* witness at *any* lawyer's request.

Do lawyers have associational rights stronger than those of the press, the general public, and a witness' relatives? In some respects the answer must be yes, because an attorney wears two hats: his own plus the client's. See *Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001). The attorney may exercise not only the rights he holds personally, but also rights he wields as agent—and persons in police custody have rights that differ from those

of the general public and the press. This confluence of rights underlies many aspects of the lawyer-client relation. But First Defense has no (relevant) rights derived from those witnesses with whom it has attorney-client relations. The constitutional right to counsel attaches only with formal charges. See *United States v. Gouveia*, 467 U.S. 180 (1984); *Kirby v. Illinois*, 406 U.S. 682 (1972). Witnesses have no right to counsel under either the fifth or the sixth amendment. See *McNeil v. Wisconsin*, 501 U.S. 171 (1991); *Minnesota v. Murphy*, 465 U.S. 420 (1984). *Moran* holds that even persons in custody, who *do* have a constitutional right to counsel, have no right to notice that a lawyer is at the door, or to meet with counsel in the interview room. Their right is to terminate the interrogation, not to have counsel on the spot. See *Duckworth v. Eagan*, 492 U.S. 195 (1989).

Attorneys often engage in political speech—either directly or through solicitation or representation of clients—and enjoy in that endeavor the highest degree of protection. See *In re Primus*, 436 U.S. 412 (1978); *NAACP v. Button*, 371 U.S. 415 (1963). Yet First Defense seeks to counsel witnesses in private, and the practice of law under the protection of the attorney-client privilege is not part of the marketplace of ideas. Quite the contrary: lawyers *as counselors* are subject to entry control (licensing) and extensive ethical regulation, cf. *Florida Bar v. Went for It, Inc.*, 515 U.S. 618 (1995), of a kind that could not be imposed on the press or the speaker on a soapbox. What lawyers say in confidence to witnesses is covered by a privilege and will not play any role in public debate. So First Defense does not enjoy especially strong rights of access or speech: it is not exercising any entitlements on behalf of clients and, as a potential giver of legal advice, is subject to greater regulation than a newspaper reporter would be.

This brings us back to the point that interrogation rooms are not public forums, and that even the press lacks a general right of access to the places in which public agencies conduct their business. See *Houchins*; cf. *Los Angeles Police Department v. United Reporting Publishing Corp.*, 528 U.S. 32, 40 (1999); *Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37, 48 (1983); *Pell v. Procunier*, 417 U.S. 817, 835 (1974). Two other circuits have applied this principle to conclude that lawyers lack any first amendment right of access to clients inside public buildings. See *Cuban American Bar Association, Inc. v. Christopher*, 43 F.3d 1412, 1429 & n.21 (11th Cir. 1995); *Ukrainian-American Bar Association v. Baker*, 893 F.2d 1374, 1381-82 (D.C. Cir. 1990). These opinions hold, following *Moran* and *Duckworth*, that the relevant right is the one held by the client—to stop the interrogation (and, for a witness, to walk out of the station)—rather than any right distinctive to an attorney.

Nonetheless, First Defense contends, even if the police could exclude everyone from the interview room, they may not discriminate according to viewpoint. Its "viewpoint," according to First Defense, is that witnesses should know their legal rights, especially their right to stop talking. The district court found that the police permit relatives and clergy into the interview room when that will promote cooperation; it is unconstitutional viewpoint discrimination, the court held, to exclude those who may advise witnesses not to cooperate.

Chicago replies—and First Defense appears to concede—that it does not pick and choose among private lawyers. It does not notify witnesses when pro-cooperation lawyers (sent, say, by neighborhood anti-crime associations) show up, but refuse to notify witnesses when anti-cooperation lawyers knock on the door. Chicago's practice is, as the district court found, to afford access to coun-

sel only if the witness initiates the request. It does admit assistant state's attorneys, but no constitutional rule provides that if public employees enter a given public space, private parties have a like degree of access. It is not "viewpoint discrimination" to insist, for example, that public prosecutors handle a trial on behalf of a state, without giving defense attorneys an equal crack at presenting the state's evidence. Distinctions among roles differ from viewpoint discrimination. Public buildings and proceedings may be devoted to those chosen to carry out public purposes. *Cornelius v. NAACP Legal Defense and Education Fund, Inc.*, 473 U.S. 788 (1985), is among many cases showing that access to public property may be limited to persons who advance the goal of the public organization. In *Cornelius* this meant that charities that would undermine the purpose of a fund-raising drive (by driving away donors) could be excluded; for the same reason the public agency need not distribute with the fund-raising packet a leaflet urging the employees not to give one red cent. Just so here: by admitting public prosecutors who urge witnesses to cooperate, the city does not oblige itself to give "equal time" to private attorneys who are likely to urge witnesses to clam up.

Lots of public agencies limit access to those private persons who advance their mission. For example, polling places exclude advocates for abstention. People who want to boycott the election may form a picket line outside; the first amendment does not entitle them to contact each voter inside. States may send prosecutors into grand jury rooms while excluding defense attorneys; witnesses who want to consult counsel must walk outside the grand jury room, just as witnesses may leave the stationhouse to meet with lawyers. And the first amendment does not require a state that decides to perform abortions at a public hospital to employ surgeons who refuse to carry out that procedure, or to notify wom-

en that representatives of Operation Rescue want to be admitted to talk them out of ending their pregnancies. See *Hill v. Colorado*, 530 U.S. 703 (2000). (And the reverse: a public hospital that has decided not to perform abortions, see *Poelker v. Doe*, 432 U.S. 519 (1977), need not set up a space inside so that representatives of Planned Parenthood may offer opposing views. Government may promote one side of an issue, provided that it does not inhibit opponents' use of private resources. See *Rust v. Sullivan*, 500 U.S. 173 (1991).)

A public hospital may welcome family members who will calm and comfort patients without obliging itself to give equal access to those who promote faith healing or other non-scientific approaches. The hospital may admit allopaths to the medical staff while excluding homeopaths, even though the first amendment allows homeopaths to argue their position to the public. Likewise a police station may admit those who help it enforce the laws while excluding those who it believes have a different goal. *Houchins* shows this. The prison excluded reporters (except as participants in monthly guided tours) while routinely admitting the prisoners' family and lawyers. If it was not forbidden viewpoint discrimination to prefer lawyers over reporters in a prison, it is not viewpoint discrimination to prefer prosecutors, family, and clergy over defense lawyers in a police station. The goal in either case is not to throttle a disfavored viewpoint, but to devote the public building to the purpose for which it is maintained.

First Defense therefore has neither a personal right, nor one derived from its clients, to have the police notify witnesses that a lawyer is at the front desk, let alone a right to be escorted inside immediately and to engage in confidential consultations within the police station. Any violations of suspects' rights to be free of trickery, wrongful imprisonment, and compulsory self-incrimina-

tion must be redressed after the fact (by damages or exclusion of evidence) rather than by a regulatory injunction issued in a case to which no witness is a party. The injunction issued by the district court accordingly is

REVERSED.

A true Copy:

　　　Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*