# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 03-4117

EVELYN CARREON, R.N., NASSER DIAB,
R.N., AGNES HAYES, R.N., *et al.*,

*Plaintiffs-Appellants*,

*v.*

ILLINOIS DEPARTMENT OF HUMAN
SERVICES, HOWARD PETERS, former
Director of the IDHS, LINDA R. BAKER,
Director of the IDHS, *et al.*,

*Defendants-Appellees.*

———————

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 00 C 5538—**William T. Hart**, *Judge.*

———————

ARGUED SEPTEMBER 24, 2004—DECIDED JANUARY 21, 2005

———————

Before FLAUM, *Chief Judge*, and RIPPLE and WILLIAMS,
*Circuit Judges.*

FLAUM, *Chief Judge*. Plaintiffs-appellants are seven cur-
rent and former employees of a mental health facility run
by the Illinois Department of Human Services ("IDHS").

Plaintiffs allege that they were fired, suspended, or otherwise reprimanded in retaliation for speaking out on matters of public concern in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs filed this action under 42 U.S.C. § 1983 against the IDHS, its secretary, and members of the hospital's management. The district court granted summary judgment in favor of all defendants on all claims, and plaintiffs appealed. For the reasons stated herein, we affirm.

## I.  Background

The Madden Mental Health Center ("Madden Center") is a mental health facility operated by the IDHS just west of Chicago in Hines, Illinois. The Center is staffed twenty-four hours per day, and many of its patients have difficult behavioral issues. Plaintiffs are three Madden Center nurses (Evelyn Carreon, Ruth Loveless, and Ronald Simmons), three former nurses (Nasser Diab, Agnes Hayes, and Joseph Mungai), and one former housekeeper (Henry Taylor). Plaintiffs filed this First Amendment retaliation suit under § 1983, naming as defendants the IDHS, IDHS secretary Linda Baker, Madden Center hospital administrator Patricia Madden, director of personnel and human resources Suzanne Varso, and former Madden Center facilities director Ugo Formigoni. Because most of plaintiffs' claims rely upon a common legal theory, we will first discuss the legal framework applicable to that theory, and then apply the law to the facts of each claim.

## II.  Discussion

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In evaluating the district court's decision, we 'must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party.'" *Morfin v. City of East Chicago*, 349 F.3d 989, 996-97 (7th Cir. 2003) (quoting *Conley v. Village of Bedford Park*, 215 F.3d 703, 708 (7th Cir. 2000)). We review the district court's grant of summary judgment de novo. *Id.* at 996.

Plaintiffs allege that the IDHS and the Madden Center management retaliated against them for exercising their First Amendment rights. While the government enjoys greater latitude in regulating the speech of its employees than that of the general public, a citizen does not surrender all First Amendment protection by accepting a job with a governmental entity. *Pickering v. Bd. of Educ. of Township High Sch. Dist. 205*, 391 U.S. 563, 568 (1968). A governmental employee may establish a *prima facie* case of First Amendment retaliation by showing that the speech in question: (i) is constitutionally protected; and (ii) "played a substantial or motivating factor" in the employer's decision to retaliate against the plaintiff. *Gustafson v. Jones*, 290 F.3d 895, 906 (7th Cir. 2002). If the plaintiff establishes these elements, the burden shifts to the defendant to prove by a preponderance of the evidence that it would have taken the same action in the absence of the protected speech. *Id.*

The court applies a two-part analysis to determine whether the speech is constitutionally protected. *Sullivan v. Ramirez*, 360 F.3d 692, 698 (7th Cir. 2004); *see also Connick v. Myers*, 461 U.S. 138 (1983); *Pickering*, 391 U.S. at 568. First, the speech is protected only if it addressed a matter of public concern. *Sullivan*, 360 F.3d at 698. This depends upon "the content, form, and context of [the speech] as revealed by the whole record." *Id.* (quoting *Gustafson*, 290 F.3d at 906-07). Of these considerations, content is the most important. *Id.* "The 'public concern' element must relate to a community

concern and is not satisfied by 'merely a personal grievance of interest only to the employee.'" *Id.* (quoting *Gustafson*, 290 F.3d at 907). "At bottom, we must decide whether the speech is most accurately characterized as an employee grievance, or as a matter of political, social, or other concern to the community." *Cygan v. Wis. Dep't of Corr.*, 388 F.3d 1092, 1099 (7th Cir. 2004).

Second, even if the employee spoke on a matter of public concern, the government may "restrict the speech if it can carry its burden of proving that the interest of the public employee as a citizen in commenting on the matter is out-weighed by the interest of the state, as employer, in promoting effective and efficient public service." *Gustafson*, 290 F.3d at 909. The court performs this balancing only if the employee's speech touches on a matter of public concern. *San Diego v. Roe*, 125 S. Ct. 521, 525 (2004). Whether speech is constitutionally protected under this two-part test is a question of law for the court. *Sullivan*, 360 F.3d at 698, 701.

## A. Evelyn Carreon

The Madden Center hospitalizes patients with mental health problems, many of whom act violently. The patients and staff are divided into several "pavilions." In some instances these divisions track the health needs and relative dangerousness of the patients.

Evelyn Carreon was hired by the IDHS in 1983, and has worked at the Madden Center as a supervising charge nurse since February 1, 1994. In 1999, Carreon was assigned to work in pavilion 2, caring for patients with mental, physical, and emotional problems. In July of that year, the admin-istration notified Carreon that it intended to transfer her to an intensive care pavilion ("ICP") then under construction. The Madden Center planned to hospitalize its patients most prone to commit violent acts in the ICP. Carreon had been attacked by a patient in the past, and feared that the

transfer would subject her to an increased likelihood of similar attacks. She lodged oral and written objections to the transfer. Despite her protestations, on August 16, 1999, the administration confirmed by letter that it would transfer Carreon to the ICP that fall. The ICP never opened, however, and Carreon remained in her position at pavilion 2.

Sometime after being notified of the possible transfer to the ICP, Carreon became involved in union activities, soliciting nurses to support the Teamsters Union rather than the Illinois Nurses Association. In March or April of 2000, Carreon attempted to meet with a union representative at the Madden Center during her lunch hour. According to Carreon, unidentified members of the "administration" ordered the union representative to leave the premises.

In January of 2002, Carreon was advised again that she would be transferred, this time from pavilion 2 to pavilion 7. A high proportion of patients in pavilion 7 suffer from developmental disabilities. Carreon viewed the assignment to pavilion 7 as more dangerous than pavilion 2, and objected. Perhaps because of her complaints, the transfer never occurred, and Carreon continues to work in pavilion 2.

Carreon alleges that the defendants wielded the threat of transfer to a more dangerous pavilion as punishment for her speech. Carreon identifies two instances of speech that she claims are protected: (i) her complaints about the 1999 transfer; and (ii) her advocacy in favor of the Teamsters Union. Neither instance supports a claim of First Amendment retaliation. Plaintiff's objection to the 1999 transfer raised a purely personal workplace grievance and is not protected speech.[1] Although Carreon's union advocacy

---

[1] Moreover, the Madden Center notified Carreon of the contemplated 1999 transfer before she complained or took an active role with the Teamsters Union. Thus, it cannot logically constitute

(continued...)

might qualify as speech on a matter of public concern, there is no evidence that any of the individual defendants knew of her union involvement or played a part in ordering the union representative to leave the Madden Center. Accordingly, Carreon's claim fails.

## B. Nasser Diab

Nasser Diab began working as a nurse at the Madden Center on September 13, 1994. The twenty-four-hour nursing care at the Center is staffed in three shifts. Diab was assigned to work the 8:00 A.M. to 4:00 P.M. shift, working hands-on with the Center's patients. In 1997, Diab requested that he be allowed to work from 9:00 A.M. until 5:00 P.M. so that he could drive his daughter to school before coming to work. He also offered to work through lunch to make up missed time, and requested in the alternative that he be assigned to the night shift. These requests were denied, and thereafter Diab was chronically late for work. For example, between September 1, 1999 and September 20, 1999 Diab arrived to work at least fifty-four minutes late on ten different days. He was tardy by fifty-eight minutes or more on nine different occasions between September 22, 1999 and October 3, 1999. Citing his lack of punctuality, the Madden Center fired Diab effective January 27, 2000.[2]

---

[1] (...continued)
retaliation.

[2] Diab appealed the discharge to the Cook County Circuit Court, which affirmed the decision. He did not raise a First Amendment claim in that administrative review. The district court held that Diab's claim was therefore barred by res judicata. Defendants have waived this argument on appeal. Accordingly, we assess the merits of Diab's claim.

Diab claims that he was discharged in retaliation for speaking out on matters of public concern, not because of his lack of punctuality. Plaintiff identifies six instances of speech that he argues are constitutionally protected. First, Diab cites a pair of conversations that he had with facilities director Ugo Formigoni sometime in 1995 or 1996 regarding patients, the work environment, and the theft of Diab's car. Diab gives only a vague account of these exchanges, does not tell us with any certainty when they occurred, and fails to explain why they might have motivated Formigoni to fire him.

Second, in 1997, the Madden Center had previously fired Diab. The reason for the discharge is not clear from the record. Diab appealed the termination to the Illinois Civil Service Commission, which overruled the decision and reinstated plaintiff with back pay. In January of 1998, Diab filed a Title VII suit claiming that the IDHS had fired him because of his national origin. The district court granted summary judgment in favor of the IDHS. *See Diab v. Ill. Dep't of Human Servs.*, 2003 WL 256887 (N.D. Ill. Feb. 5, 2003). Although his Title VII claim failed, Diab asserts that the filing of the lawsuit itself constitutes protected speech.

Third, Diab points to a notation he made on a patient's chart reflecting the patient's desire for additional education and training. Fourth, Diab labels as protected speech a disagreement he had with a co-worker where he admonished the employee not to yell at a patient. Fifth, plaintiff asserts that conversations he had with fellow union members about fairness, safety, and efficiency in the workplace qualify as speech on matters of public concern. Sixth, Diab claims constitutional protection in conversations he had with director of personnel and human resources Suzanne Varso about his scheduling problems, patient well-being and care, and the work environment. Diab does not describe these discussions in any detail or identify when they took place.

Diab's claim fails because he has provided no evidence that any of the identified instances of speech motivated defendants to fire him. There is no indication that defendants were aware of Diab's Title VII lawsuit, the notation he placed on the patient's chart, his disagreement with a co-worker, or his union activities. Although Diab also points to two conversations with Formigoni and Varso, plaintiff's vague description of the timing and content of these exchanges supplies no reason to suspect that the speech led to his termination.

In addition, much of Diab's speech is plainly unprotected. Diab's notation on a medical chart and his admonishment of a co-worker on one occasion not to yell at a patient address purely internal workplace grievances. And while the filing of a lawsuit may amount to protected speech, a "public employee has no First Amendment claim unless the lawsuit involves a matter of public concern." *Zorzi v. County of Putnam*, 30 F.3d 885, 896 (7th Cir. 1994); *see also Yatvin v. Madison Metro. Sch. Dist.*, 840 F.2d 412, 419-20 (7th Cir. 1988). Diab's lawsuit sought to redress only his personal grievance, was not publicized, and was not designed to encourage public debate. Plaintiff's filing of that lawsuit, therefore, is not protected speech.

Even if Diab could establish a *prima facie* case, it is clear that defendants had an adequate nonretaliatory reason to terminate him. Plaintiff concedes that he was habitually late to work for a job where twenty-four-hour nursing care is critical. The district court properly granted summary judgment in favor of defendants on this claim.

### C.  Agnes Hayes

Agnes Hayes began working as a nurse at the Madden Center's intake unit in 1993. Her duties included interviewing and assessing new patients and searching them for contraband. Like Diab, Hayes had difficulty arriving to work on

time. She was orally reprimanded for tardiness in August and November of 1999, and suspended in November of 1999 and January of 2000 for her lack of punctuality. The Madden Center fired her on May 26, 2000, citing her poor attendance record.

Hayes admits that she was late repeatedly for work, but argues that the true reason she was fired was because she had spoken out on matters of public concern. Hayes asserts that her protected speech includes: (i) complaining that the air vents and window screens in the building were dirty; (ii) reporting to the director of nursing that Hayes's supervisor was doing personal work on the clock; (iii) advising hospital administrator Patricia Madden that the Center was wasting its money by purchasing lab coats embroidered with the names of ex-employees; (iv) telling Formigoni that her office was too hot; and (v) discussing with Varso plaintiff's involvement with the union.

Hayes's claim lacks merit. Complaints about air vents, window screens, and office temperature do not address matters of public concern. Hayes's reports about the lab coats and her supervisor's abuse of time might constitute protected speech under certain circumstances because they implicate the misuse of public funds. *See Propst v. Bitzer*, 39 F.3d 148, 152 (7th Cir. 1994). But plaintiff does not describe her supervisor's behavior as so pervasive that it would substantially impact the public fisc, and did not report the practice to anyone outside the Madden Center. *See Metzger v. DaRosa*, 367 F.3d 699, 702 (7th Cir. 2004). Nor has Hayes alleged that the lab coat vendor was intentionally defrauding the hospital. Again, plaintiff reported this problem only internally. Under the circumstances, these complaints do not touch upon matters of public concern.

While a debate about union activities might merit First Amendment protection, there is no evidence that Hayes's conversations with Varso on this topic led to her termina-

tion. When Hayes advised Varso that she supported the Teamsters Union, Varso responded, "[i]t's your choice." Hayes later complained to Varso that her union grievances were being processed slowly. Varso advised her to discuss the issue with the union. Far from revealing a motive to fire Hayes, Varso's responses suggest that she did not care either way about Hayes's involvement in the union. Finally, Hayes's dismal attendance record justified her discharge.

### D.  Ruth Loveless and Ronald Simmons

The claims of Ruth Loveless and Ronald Simmons interrelate, and we discuss them together. Ruth Loveless supervises the nurses in pavilion 7, including Ronald Simmons. In August of 1999, a patient attacked Simmons. Loveless, Simmons, and Valarie Brown, a mental health technician, together subdued the patient. Brown believed that Simmons had used excessive force in restraining the patient and filed a report to that effect. Prompted by the report, the director of nursing questioned the three employees about the incident. Simmons denied any wrongdoing. Loveless, who had made no mention of Simmons's conduct until questioned, stated that Simmons had used a "strong hold" in subduing the patient but did not apply excessive force.

Madden Center policy requires that any employee accused of patient abuse, and any supervisor who fails to report abuse alleged to have occurred in their presence, be automatically reassigned to nonpatient duties pending an investigation. Pursuant to this policy, both Simmons and Loveless were transferred to administrative assignments.

In the months that followed, the Illinois State Police investigated whether Simmons used excessive force. An IDHS internal security investigator repeatedly contacted Simmons to attempt to arrange for his interview by the police. When Simmons stated that he would not meet with the police outside the presence of his attorney, the IDHS

investigator advised him that he did not need an attorney for the meeting. Simmons persisted, and eventually met with the police with his attorney at his side.

The investigation found that Simmons had not used excessive force. But a supervisor believed that Simmons's refusal to meet with the police without his lawyer violated Madden Center policy requiring that employees cooperate with official investigations. Simmons received a three-day suspension. Loveless was suspended for one day for the stated reason of "failing to follow policy and procedure." The parties do not explain what policy or procedure Loveless is alleged to have broken. Both Loveless and Simmons were transferred back to patient care after serving their suspensions.

Loveless contends that both the assignment to nonpatient duties and the one-day suspension amount to retaliation for speaking out in defense of Simmons. The decision to assign Loveless to nonpatient duties was predetermined by Madden Center policy. Accordingly, it cannot support Loveless's claim because "enforcing a policy applicable to all employees cannot reasonably be described as a penalty for speech." *Taylor v. Carmouche*, 214 F.3d 788, 792 (7th Cir. 2000). As for the suspension, neither party explains how it relates to Loveless's speech. Assuming *arguendo* that her speech motivated the suspension, Loveless's claim nevertheless fails because her account of Simmons's conduct addressed a matter internal to the Madden Center's operation. Plaintiff did not attempt to publicize the event or press for changes to the hospital's policy on patient abuse. Because the speech did not address a matter of public concern, summary judgment was appropriate.

As for Simmons, we emphasize that neither his amended complaint nor his appellate brief raise a Fifth Amendment, Sixth Amendment, or procedural due process claim. Ac-

cordingly, we do not address these issues, but focus on the sole theory raised by Simmons on appeal: that his three-day suspension[3] constitutes retaliation for the exercise of his First Amendment rights. It is clear that plaintiff's insistence that his lawyer be present during the interview motivated defendants to suspend him; this was the stated reason. The question thus becomes whether plaintiff had a First Amendment right to demand that his attorney accompany him in the interview room.

Simmons's insistence on the presence of counsel implicates the overlapping First Amendment rights of speech and association. To the extent that the request for a lawyer, like the filing of a lawsuit, *see Zorzi*, 30 F.3d at 896, constitutes speech, Simmons can establish a retaliation claim only if the speech addressed a matter of public concern. *Id.* Plaintiff never sought a public debate or systemic changes on patient abuse or Madden Center policies. The only apparent motive for the request was Simmons's desire to protect himself. This purely personal interest does not constitute a matter of public concern. *See Cygan*, 388 F.3d at 1099. Accordingly, plaintiff's speech retaliation claim fails.

The freedom of association embodied in the First Amendment also protects Simmons's right to meet with his attorney. *See United Mine Workers of Am., Dist. 12 v. Ill. State Bar Assoc.*, 389 U.S. 217, 221-22 (1967); *Bhd. of R.R. Trainmen v. Va. State Bar*, 377 U.S. 1, 8 (1964); *NAACP v. Button*, 371 U.S. 415, 428-29 (1963). There is authority for the proposition that a governmental employee's right to associate with his lawyer extends to matters of private concern. *See Denius v. Dunlap*, 209 F.3d 944, 954 (7th Cir. 2000) ("[T]he right to obtain legal advice does not depend upon

---

[3] Simmons challenges only the suspension, conceding that defendants appropriately reassigned him to nonpatient duties pending the outcome of the investigation.

the purpose for which the advice is sought."). Simmons's First Amendment claim, to the extent that it is based on his right of association, does not fail merely because he sought legal representation on a matter of private concern. *Id.* But accepting that a governmental employee's right to associate with his lawyer is not solely limited to meetings that address matters of concern to the community, such freedom of association does not necessarily imply an unconditional right to meet with counsel in any governmental venue at any time. *See United States Postal Serv. v. Council of Greenburgh Civic Assoc.*, 453 U.S. 114, 129 (1981) ("[T]he First Amendment does not guarantee access to property simply because it is owned or controlled by the government.").

The right of access depends upon whether the forum at issue is: (i) a traditional public forum; (ii) a forum made public by designation; or (iii) a nonpublic forum. *Perry Educ. Assoc. v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45-46 (1983). Traditional public forums are "places which by long tradition or by government fiat have been devoted to assembly and debate." *Id.* at 45. This category includes "streets and parks which 'have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Id.* (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939)). The government may impose content-based regulation of speech in a traditional public forum only if it shows "that its regulation is necessary to serve a compelling state interest and it is narrowly drawn to achieve that end." *Id.* The state may also enforce content-neutral time, place, and manner regulations that "are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id.*

A forum made public by designation "consists of public property which the state has opened for use by the public as

a place for expressive activity." *Id.* "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a non-traditional forum for public discourse." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 803 (1985). "Although a state is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum." *Perry*, 460 U.S. at 46.

Nonpublic forums include "[p]ublic property which is not by tradition or designation a forum for public communication." *Id.* "In addition to time, place, and manner regulations, the state may reserve [a nonpublic] forum for its intended purposes, communicative or otherwise, as long as the regulation of speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* "Implicit in the concept of the non-public forum is the right to make distinctions in access on the basis of subject matter and speaker identity." *Id.* at 49.

We define the forum at issue by focusing on the access sought by, but denied to, the speaker.[4] *Cornelius*, 473 U.S. at 801. There is no suggestion that the Madden Center tried to prevent plaintiff from meeting with his lawyer on his own time, or sought to interview Simmons before he had a chance to confer with counsel. Nor has plaintiff presented

---

[4]  A typical question in a First Amendment right of access case is whether the government can be compelled to grant admission to a given forum. *See, e.g., Perry*, 460 U.S. at 41. Because Simmons's attorney was ultimately permitted to attend the meeting, the question in this case is not whether defendants can be required to grant access, but whether defendants unlawfully retaliated against plaintiff for demanding access guaranteed to him by the Constitution. Under these circumstances, we will define the forum as the place where defendants believed it was inappropriate for plaintiff's attorney to be in attendance.

evidence that defendants demanded that he reveal privileged communications, *cf. Denius*, 209 F.3d at 955, or sanctioned him for filing this lawsuit. Rather, what defendants found objectionable was plaintiff's insistence that he bring his lawyer with him to the interview. Accordingly, the relevant forum is the interview room.[5]

It is clear that a room used to interview a person suspected of committing a crime is not a public forum. *See First Def. Legal Aid v. City of Chicago*, 319 F.3d 967, 971 (7th Cir. 2003) (police interrogation rooms not public forums); *see also Ukrainian-Amer. Bar Assoc., Inc. v. Baker*, 893 F.2d 1374, 1381 (D.C. Cir. 1990) (INS interview rooms not public forums). This case is no exception. The police interview was conducted in private with attendance limited to a handful of people. The meeting focused on the discrete question of whether Simmons used excessive force in subduing the patient. A free and open debate among members of the public would have been plainly inconsistent with the purpose of the meeting. "We will not . . . infer that the government intended to create a public forum when the nature of the property is inconsistent with expressive activity." *Cornelius*, 473 U.S. at 803.

Because the interview room was a nonpublic forum, the defendants were free to exclude Simmons's attorney on any viewpoint-neutral basis reasonably related to the purpose served by the forum. *Cornelius*, 473 U.S. at 806. The apparent motive for keeping plaintiff's lawyer out of the interview room was the belief that he would obstruct the inves-

---

[5] The record does not disclose whether the interview took place at the Madden Center or a police station. But the purpose of the meeting and its private nature would have been the same in either building. Accordingly, the exact physical location of the meeting does not affect our First Amendment analysis. We express no view on whether areas outside an interview room, either at the Madden Center or a police station, are public forums.

tigation. This does not constitute viewpoint discrimination. *See First Def. Legal Aid*, 319 F.3d at 972 ("[B]y admitting public prosecutors who urge witnesses to cooperate, the city does not oblige itself to give 'equal time' to private attorneys who are likely to urge witnesses to clam up."). There is no evidence that defendants sought to deprive Simmons of the benefit of his counsel's views—plaintiff had ample time to confer with his attorney before and after the interview.

Accordingly, the freedom of association guaranteed by the First Amendment (as opposed to rights secured by the Fifth Amendment, Sixth Amendment, or Due Process Clause) did not confer upon Simmons the unconditional right to bring counsel to an internal investigational interview with the police. Because plaintiff has not established that he engaged in conduct protected by his rights of speech or association, his claim fails.

### E. Joseph Mungai

Joseph Mungai began work for the Madden Center as a nurse in 1994. Although Mungai has been disciplined several times by the Center, this appeal focuses solely on a transfer within the hospital in 2000. On February 17, 2000, a patient threatened to kill Mungai. The patient was restrained before he could physically harm Mungai, but plaintiff was emotionally shaken by the incident. Mungai left work without finishing his shift and called in sick the next day. Upon his return to work following a long weekend, Mungai was threatened again by the same patient. Mungai immediately left work. The next day, plaintiff called in sick and advised his supervisor that he would not return to work until either he or the patient was transferred to a different pavilion. The Madden Center granted Mungai's request and transferred him to a new pavilion the following day. Mungai believes the new pavilion is even more dangerous than his previous assignment.

Mungai argues that the Madden Center punished him for speaking up by granting the request, but assigning him to an even less desirable position. In essence, Mungai claims that the defendants are teaching him to be careful what he wishes for, and that this violates the First Amendment. Assuming that we could characterize the transfer as retaliation, rather than as an attempt to accommodate Mungai's request, plaintiff's claim would fail. Mungai did not publicly air the issue or advocate for systematic changes in hospital policy. While plaintiff's safety is important to him, under these circumstances it is not a matter of public concern. Summary judgment on this claim was appropriate.

## F.  Henry Taylor

Henry Taylor was hired as a housekeeper at the Madden Center on May 26, 1992. Like Diab and Hayes, Taylor frequently showed up late for work. Each of Taylor's performance evaluations from 1993 through 1999 states that plaintiff had a problem with tardiness. Between October 1999 and the end of March 2000, Taylor was late for work twenty-six times, and had eleven unexcused or unreported absences. The Madden Center fired Taylor effective June 7, 2000, citing his abuse of time. Taylor does not challenge defendants' account of his attendance.

Taylor was afforded an administrative hearing prior to being fired. He requested and was granted union representation at the hearing. Before the district court, Taylor argued that the true reason for his termination was because he had asked for union representation at his pretermination hearing. On appeal, Taylor gives no coherent account of his First Amendment claim. His brief states that he was "active in asserting his union rights," but does not explain whether this refers to plaintiff's request for union representation. The brief does not describe the content of the speech, its context, whether defendants were aware of it, or how it could have motivated defendants to fire Taylor. Accordingly, Taylor has

forfeited the claim. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) (holding that "perfunctory and undeveloped arguments that are unsupported by pertinent authority" are forfeited on appeal). Were we to reach the merits, it is clear that defendants had sufficient reason to fire Taylor unrelated to any protected speech.

## G. Interrelated Nature of Plaintiffs' Claims

At oral argument, plaintiffs' counsel argued that the district court erred by refusing to account for the interrelated nature of plaintiffs' claims. Counsel asserted that the court mistakenly analyzed each claim in isolation, failing to recognize the significance of the overarching pattern apparent when one views plaintiffs' claims collectively. This argument does not appear in plaintiffs' appellate brief, and we will not consider it. *See Szczesny v. Ashcroft*, 358 F.3d 464, 465 (7th Cir. 2004).

## III. Conclusion

Plaintiffs' First Amendment retaliation claims fail as a matter of law. Accordingly, we AFFIRM.

A true Copy:

      Teste:

                        _____

                        *Clerk of the United States Court of Appeals for the Seventh Circuit*